CASE 88.—PROSECUTION AGAINST JOHN B. ETLY FOR MURDER.—December 2.

## Etly v. Commonwealth

Appeal from Jefferson Circuit Court; Criminal Division.

JOSEPH PRYOR, Judge.

Defendant convicted and appeals—Reversed.

1. Criminal Law—Appeal—Verdict—Conclusiveness—Credibility of Witnesses.—The jury may rely on the testimony of a witness, and the court on appeal cannot disturb the verdict on the ground that the witness was unworthy of belief because of the impeaching testimony.

2. Homicide—Evidence—Admissibility.—Where, on the trial of a husband for the murder of his wife, the prosecution relied on a witness who was impeached, and the circumstances showed the possibility of another committing the offense,

evidence that the latter committed the offense was properly excluded.

3. Same.—On a trial of one for murder, evidence that another caused decedent's death is admissible, though insufficient to justify his conviction if on trial.

4. Continuance—Adjournment Pending Trial—Absence of Witnesses.—Where the absence of a witness who had been subpoenaed for accused, and who had been sworn and put under the rule, and who did not appear when called late in tne afternoon and at the time the court usually adjourned, was important to accused, the refusal to grant an adjournment until the following morning to enable accused to produce the witness was erroneous.

5. Reception of Evidence—Reopening Case—Newly Discovered Evidence.—Where, on the trial of a husband for the murder of his wife, the prosecution relied on the testimony of a witness who was impeached, and the circumstances indicated that another person might have committed the homicide, the refusal to permit accused to introduce newly discovered evidence on the morning following the conclusion of the evidence, to the effect that fresh print of a bloody thumb on the top of a board in the fence at the rear of the house was discovered, and that the blood was human blood, was an abuse of discretion prejudicial to accused.

JOHN C. STROTHER and CLEM W. HUGGINS for appellant.

JAS. BREATHITT, Attorney General, and TOM B. McGREGOR, Assistant Attorney General for Commonwealth.

(No briefs—record out of office.)

OPINION OF THE COURT BY JUDGE SETTLE—Reversing.

The appellant, John B. Etly, was indicted in the court below for the murder of his wife, Virginia Etly. The trial resulted in his conviction; the punishment awarded being confinement in the penitentiary for life. He was refused a new trial, and has appealed.

Mrs. Etly was murdered about midnight November 8, 1906. The crime was brutal, both in its conception

and execution, and naturally caused in the public mind great excitement and indignation. The family of appellant at that time consisted of himself, wife, and six children, the eldest, Anna Etly, being 14 years of age, and the youngest 11 months old. Appellant is 50 years of age, and his wife was perhaps 15 years his junior. The Etly home was a small house, consisting of three rooms, and shed room addition, situated on the west side of Brook street, near the corner of Brandies, in the city of Louisville; the locality being known as the "Bottoms." Police Reiss and Foe, whose beat included that locality were summoned by appellant to his residence, which they reached about 12:45 o'clock. They found there appellant and all his family, save a son, W. J. Etly, 13 years of age, who was at an infirmary ill of typhoid fever; also two or three women of the immediate neighborhood, and Dr. Moir, a physician, all of whom had been hastily called to his home by appellant. To each and all these persons he described the condition in which his wife was found by him and the manner in which he was informed of it, and the same story was told by him when testifying in his own behalf in the circuit court. His version of the matter was that while asleep in the front room in bed with a little daughter, Beulah, 7 years of age, he was awaked by his eldest daughter, Anna Etly, who came to his room and told him something awful had happened to her mother; that he immediately left his bed, and went into the second room, where his wife was occupying a bed with the two younger children, and going at once to her, discovered her throat had been cut and was profusely bleeding; that he tried to ascertain from her how it had occurred, and who had wounded her, but could gain no information as she

was unable to talk; that he then tried by tucking the bed clothing about her neck to stop the flow of blood, but, failing in this, ran in his sock feet to where he could telephone a physician and the police, and to the houses of two or three of his neighbors to get their assistance, after which he at once returned to his own home, and, in conjunction with the women whom he had summoned, did all that could be done for the relief of his wife, who died shortly after his return. Anna Etly, who slept in the same room, but in a different bed from that used by her mother, at that time told substantially the same story told by her father, with the addition that she was awakened by a noise from her mother which sounded as if she were strangling; that one of the little children who had been in bed with the mother was standing out in the floor, asking or crying for water; that she (Anna) went to her mother, and, seeing blood on the bed and hearing the peculiar noise as of strangling continue, then walked to the door leading into the room occupied by her father, and asked him to come to her mother's assistance which he at once did. When the policemen reached the house, they proceeded to look through the rooms and about the premises, seeking a clue to the assassin, but found nothing upon which to rest a safe conclusion. At their request appellant showed them his razor and the table-knives in the house, also a butcher knife used in the kitchen for cutting meat. The razor blade was both clean and dry, and the table knives too dull to have inflicted the wounds received by Mrs. Etly. The butcher knife, while furnishing no appearance of having been recently used, had on the blade near the handle a stain which the policemen thought might be blood, so they turned it over to a chemist for ex-

amination, who testified he was unable to say it was human blood. The three rooms of the Etly house, exclusive of the small shed room, are situated one behind the other, with a door in each of the two first rooms opening into the one behind it, and the door in the third room opening onto a small back porch. There was a front door in the first room, through which a passage was allowed to Brook street, and also a double window. The doors leading from the front to the second room, from the second to the third room, and from the third room to the back porch were found open immediately after Mrs. Etly was discovered to have been wounded, as was one of the double windows in the front of the first room. South of the Etly house was a vacant lot inclosed by a low board fence which was not over 3½ feet in height. A panel of the picket fence separating the Etly house from the street had a day or two before the death of Mrs. Etly been removed to allow the hauling of dirt to fill the side and back of the Etly lot. On the night of and immediately following the killing of Mrs. Etly this loose or removed panel, which had previously been leaning against the fence at the side of the house, was found to have been placed against the wall of the house and under the open window at the front. The base of the window was from 5 to 5½ feet from the ground, and a man, with the aid of the panel of fence leaning against the house, could easily have gotten through the open window into the front room and through its open door into the second room where Mrs. Etly slept, thence through that room and the third room out on the back porch, and from that point escape through the vacant or south lot, with but little danger of discovery. It is true no marks were found in the dust

covering the lower sill of the open window, but the inspection of the window sill was apparently not made until the morning after the murder, and counsel for appellant insist that it is not unreasonable, in view of the number of people passing in and about the house the night of and morning following the murder, that dust should have again accumulated on the window, though displaced the night before. Besides, they argue that, according to the evidence, it was possible for one by the use of the loose panel of fence to step through the window without disturbing the dust on the sill. It appears from the evidence that two wounds were inflicted upon Mrs. Etly, each of which was fatal. One of these severed the carotid artery, and the other, a cut on top of and near the front of the head, penetrated the brain to a depth of 1 1-8 inch. Though in doubt as to the character of the weapon by which the cut on the head was inflicted, Dr. Kelly, the coroner, testified that it might have been pro-duced by a butcher knife like that found at appellant's house, but it had more the appearance of having been inflicted by a dirk, or the corner blade of an axe or hatchet. He was, however, positive that the wound upon Mrs. Etly's head could not have been received while she was in a recumbent position, and it was his opinion that she was sitting up in bed or standing upon her feet when that particular wound was inflicted. Dr. Kelly was confident that the wound on the neck was produced by a sharp-edged weapon, and expressed the opinion that the butcher knife could have inflicted it. But it was in contradiction of Dr. Kelly, proved by the testimony of a least two persons, one a policeman, that at the time of the autopsy he, upon seeing the butcher knife, expressed

the opinion that neither of the wounds upon the person of Mrs. Etly had been inflicted with it.

Notwithstanding the account given by Anna Etly on the night of her mother's murder of what she saw and heard of the tragedy, and its complete exoneration of her father from all connection with the crime, she later, and after several days' separation from him, and the family, told certain representatives of the Commonwealth a wholly different story, which charged him with the murder of his wife, and this story she adhered to when testifying as a witness on his trial. The last version was to the effect: That while lying on her bed several feet from that of her mother, by means of a lamp dimly burning in the room, she saw her father walk through their room into the kitchen, return to the bed occupied by her mother, and lie down upon it, at which time he had a knife in his right hand which he drew across her mother's throat on the right side of the neck; this being the location of the wound as told by Dr. Kelly. That her father then got up and went back to the front room, and she hearing the commotion made by her mother went to her, and seeing her condition, walked to the door and called her father, who came into the room and to her mother's bed, telling her (Anna) if she ever told what he had done, he would kill her in the same way, after which he went out and summoned the physician, neighbors and police. Certain physical facts were brought out in evidence by appellent to discredit this story of the girl. Among others that if Mrs. Etly when cut with the knife on the right side of the throat was, as the daughter testified, lying on her back and with her right side toward the south wall, the blood, naturally following the least resistance would have spurted on the headboard on

her right or against the south wall, instead of in the direction of the west wall as it did, and on which some of it spurted as high as five feet. The head of the bed was in the direction of where the west and south walls cornered and the foot extending out into the room about midway between the west and south walls. Again, the girl testified to but one stroke of the knife by her father when she said he drew it across the right side of her mother's throat, whereas, there was, as Drs. Kelly and Moir testified, another fatal wound on top of the head which penetrated the brain more than an inch, and which could not, according to their further testimony, have been inflicted unless Mrs. Etly was sitting up in bed, or standing upon her feet. Anna did not claim to have seen her in either position, but testified that she was lying on the bed throughout the attack upon her with the knife. It is further contended that Anna Etly's story of the crime was further discredited by her own conduct on the night of the murder. According to the testimony of some of the persons called to her home that night, when her father seemed overcome with grief because of the death of his wife, Anna sat upon his knee and attempted to console him by telling him that she would help him raise the younger children. It is earnestly argued by appellant's counsel that Anna would not have so conducted herself towards her father, if he was, as she afterwards testified, such a monster as to kill her mother in her presence, and threaten her with a like fate if she informed on him.

It is also urged as a significant fact that Anna Etly continued to exonerate her father of the crime charged against him until she was placed under legal restraint, if not arrest, and became afraid the crime would be laid at her door, and, further, that the falsity of her last story was demonstrated by an affidavit which she

gave her uncle, D. J. Etly, and one Hagan, after she was placed in the custody of the institution where she is yet confined. By the affidavit in question she repudiated the story implicating her father and reaffirmed the one told by her on the night of her mother's death, but later repudiated the affidavit, and returned to the story of her father's guilt. An attempt was also made, not wholly without success, to impeach the reputation of Anna. It was also proved that she was not fully subservient to parental control, and that her mother or father, perhaps both of them, shortly before the murder. of the mother, whipped her on account of her disobedience. It does not seem to be contended by counsel for appellant that Anna Etly murdered her mother, but it is insisted that the evidence as strongly conduced to show her guilt as that of appellant; it being claimed that the resentment of the girl arising from the punishment for her disobedience inflicted by the mother, or by the father at the mother's instigation, together with the desire to be rid of the mother's constant surveillance and control, may have furnished a motive for the crime, whereas the evidence, it is claimed, furnished no proof of a motive on the part of appellant.

On the other hand, counsel for the Commonwealth, while pointing to no proof of motive on the part of appellant, nevertheless insist that there was evidence conducing to show his guilt. For instance it is argued that the bed on which he claimed to have slept in the front room with his little daughter gave no appearance of having been occupied by him, and that only the side of the bed in which the little girl was seen appeared to have been used. Two or three witnesses testified as to the appearance of the bed. Whether their inspection was more than a casual look does not

appear. None of them seemed to know which side of the bed appellant had occupied, whether his little daughter had lain upon the side that did not appear to have been used, or whether she moved, after he left the bed, to the place his body had occupied. It seemed to have been known to Anna Etly and her seven-year-old sister that appellant and the entire family retired that night at 9 o'clock, and that he lay down on the bed in the front room with Beulah. The conclusion deduced by appellant's counsel from this undisputed fact is that if the bed contained a single mattress, as the proof seemed to indicate, it was not impossible that appellant could have slept upon it three hours without materially disarranging it or the bed cover. A further fact relied on by counsel for the Commonwealth as evidencing appellant's guilt was the presence upon his shirt sleeves and drawers of blood. It is argued by his counsel that his explanation of that matter was altogether reasonable; that is, that he received the blood stains upon his clothes in ministering to his wife when he reached her bedside after being awakened by Anna, and that to the unbiased mind it is not perceivable that the blood upon appellant's clothes afforded any stronger proof of his guilt than did the appearance of blood, which the evidence shows was noticeable upon the clothing of Anna, prove her guilty of the murder of her mother.

Counsel for the prosecution lay great stress upon the statement which Beam and wife claim to have received from appellant when he asked them to go to his house and give their assistance to his wife, which was that his wife had fallen upon a door knob and cut her throat, and insist that the absurdity of this statement is a circumstance that tends to show his guilt. Appellant denied the statement attributed to

him by the Beams, and claimed to have said to them what he said to the other neighbors whose services he sought that night, viz., that his wife had been cut or somebody had cut her. His denial of the statement testified to by Beam and wife was in some measure supported by the two women of the neighborhood to whom he applied before going to the house of Beam who testified that he informed them somebody had cut his wife. This also seems to have been the statement he made to the policeman. There was also testimony from the persons summoned to appellant's home the night of the murder which tended to show that he was then apparently inclined to the belief that his wife had committed suicide; for before her death, and following an appeal to her to tell him who her assailant was, he asked her why she had done this, or words to that effect. It is also insisted for appellant that the evidence wholly failed to furnish a motive on his part for the crime, or show anything in his conduct at the time of, prior to, or following the assassination of his wife that was inconsistent with his innocence of the crime, and that not only was there no proof of a motive, but the evidence furnished indisputable proof of his good character, viz., that he was an honest, industrious, sober, and peaceable man, also that he apparently entertained a warm affection for and was invariably kind to his wife and children, was domestic in his tastes, and that he faithfully applied to the support of his family the wages of $9 a week he was earning.

We have set out at length the substance of the evidence contained in the record because of the appellant's contention that it wholly fails to prove his guilt. It is not our province to express an opinion as to the guilt or innocence of appellant, nor is it our purpose

to further discuss the evidence except to say that it shows the Commonwealth to have been mainly dependent upon the testimony of Anna Etly for the conviction of appellant, and it is patent that the verdict must have resulted from the jury's acceptance of her testimony. This, however, the jury had a right to do, and we can not disturb the verdict upon the ground that Anna Etly was unworthy of belief; that being a matter the jury could alone determine. To authorize a reversal, there must have been error in some ruling of the trial court prejudicial to appellant's rights.

Numerous grounds are urged by appellant for a revrsal of the judgment of conviction, one of which is that the trial court erred in excluding the testimony of divers witnesses conducing to prove one James Holt guilty of the crime for which appellant was indicted and convicted. Briefly stated, the facts to which appellant's avowals show the witnesses in question would, if permitted, have testified, were that Holt was a desperate character and dangerous man, who had committed various felonies; that the day before Mrs. Etly was killed Holt was discharged from a long confinement in the city workhouse, his committal to that penal institution having been effected through the procurement and testimony of his mother-in-law, whom he greatly hated, and that both the mother-in-law and Holt's wife were so very much afraid of him that during his confinement in the workhouse they moved their residence without advising Holt where they had moved; that late in the afternoon, and in the early part of the night on which Mrs. Etly was killed, Holt then being under the influence of intoxicating liquor, and in an angry mood said to the witnesses referred to that his mother-in-law had testified against him and caused his incarceration in the work-

house; that he intended to cut her throat and kill her, and inquired where she and his family had moved. It appears from the testimony heard by the jury that Holt's wife and mother-in-lay had removed to Brook street in the "Bottoms," very near, perhaps next door, to the Etly residence, and, according to appellant's avowals, it would further have appeared by the testimony of the excluded witnesses that Holt late that afternoon learned of the place of residence of his wife and mother-in-law in the "Bottom's." By J. C. Jones appellant would, it appeared, have proved that he about dark of the day Mrs. Etly was killed met Holt near the Etly home, and pointed out to him at Holt's request the house next to that of Etly as the place of his (Holt's) wife and mother-in-law's residence. It appears from the affidavit of appellant that the witness Jones had been subpoenaed for appellant, and that he was present at the beginning and during some part of the trial, and had been sworn and put under the rule with the other witnesses. When called to testify, which was late in the afternoon and at the time the court usually adjourned, Jones did not appear, whereupon appellant, claiming to be taken by surprise at Jones' absence, asked that he be given until the next morning to produce and have him testify, which he alleged he could do, but the court refused to grant the adjournment, and over appellant's objection then completed the taking of the testimony. In excluding the testimony of the several witnesses in regard to Holt's conduct, and also in refusing to give appellant until the following morning to procure the attendance and testimony of Jones, we think the court erred. The excluded testimony was, we think, competent and of great importance to appellant. In connection with the admitted testimony in

respect to the front window found open at the Etly house immediately after the assault upon Mrs. Etly, the open doors between the three rooms of the house, and the fact that the door leading from the rear room onto the back porch was then also found to be standing open, it might have been sufficient to satisfy the jury that Holt, in attempting to execute his threats against his mother-in-law, entered the Etly home, mistaking it for hers, and by a greater mistake inflicted upon Mrs. Etly the wounds of which she died, thinking she was his much-hated mother-in-law. As said in Sidney v. Commonwealth, 1 Ky. Law Rep. 120: "On the trial of one for murder evidence tending to show that others caused the death is admissible, though not sufficient to justify their conviction, if they were on trial." Morgan v. Commonwealth, 14 Bush 106. We are of opinion that the lower court also erred in refusing appellant permission to introduce H. H. Wilson, who before the convening of the court on the morning following the conclusion of the evidence informed appellant's counsel that he and a man by the name of Nelson on the next or second day following the murder of Mrs. Etly discovered the fresh print of a bloody thumb on the top of a board of the plank fence at the rear of the Etly lot near the coal shed and between the Etly lot and the vacant lot south of it; that he and Nelson sawed off a piece of the plank containing the blood mark, and had it examined by Dr. Robins, a chemist, who pronounced it human blood. When the court met and before argument to the jury began, appellant by affidavit brought to the attention of the court this newly discovered evidence, which it was made to appear he could not have sooner discovered, and asked leave of the court to introduce it, but was not allowed to do so, to which

ruling appellant excepted. While the trial court has a broad discretion in such matters, in view of the peculiar circumstances surrounding this case and the contradictory stories of Anna Etly, the Commonwealth's principal witness, without whose testimony it could not have convicted the appellant, and the further fact that the evidence introduced with that offered was sufficient to create a strong probability that the murder might have been committed by a person other than appellant, we think the importance of the newly discovered evidence warranted its admission by the trial court, and that the court's refusal to allow its introduction was an abuse of discretion highly prejudicial to appellant.

The instructions seem to have correctly given the jury the law of the case. We refrain from discussing other alleged errors relied on by appellant, as they are not likely to be repeated on another trial, but for the reasons given in the opinion we think the ends of justice require that appellant should be granted a new trial; and to that end the judgment is reversed and cause remanded for such trial, consistent with the opinion.