. No. 25,772.

THE STATE OF KANSAS, *Appellee*, v. JOHN E. SCOTT, *Appellant*.

SYLLABUS BY THE COURT.

1. HOMICIDE—*Murder of Defendant's Wife—Evidence Tending to Show the Presence of a Notoriously Disreputable Person from Another Town Near the Scene of the Homicide Was Erroneously Excluded.* In a trial for murder, committed by one person in a residence, the state relied upon circumstantial evidence. The defendant's theory was that the murder was committed by an intruder fearing identification. Evidence was offered tending to show that within five minutes after the homicide a named person, whose home was in another town and who had a penal record for burglary, larceny and similar crimes, was observed near the scene of the homicide, and that he made his escape from the city in a few hours, and undertook by circumstantial evidence to connect him with the homicide. *Held,* it was error to exclude this evidence.

2. SAME—*Evidence Tending to Show Defendant's Infatuation for and Criminal Intimacy With a Woman Other Than His Wife, Competent to Show Motive.* In a case where a husband is charged with the murder of his wife, and the state contends that the motive was defendant's infatuation for and criminal intimacy with another woman, causing defendant to want to get rid of his wife, any evidence of circumstances before or soon after the homicide which fairly tend to establish such infatuation and intimacy, at the time of the homicide, may be received, but evidence of circumstances which only by pure speculation can be said to tend to establish such facts, should not be received.

3. SAME—*Evidence Tending to Show Trouble Between Defendant and Wife Properly Received.* In a case where a husband is charged with the murder of his wife, evidence tending to show trouble between the husband and wife, prior to the homicide and continuing up to that time, is properly received.

4. SAME—*Evidence Tending to Show Criminal Intimacy With Another Woman May Be Rebutted by Circumstantial Evidence.* Upon the trial of one charged with the murder of his wife the state attempted to establish a motive by circumstantial evidence tending to show that defendant was criminally intimate with another woman. *Held,* that defendant was entitled to rebut that showing by circumstantial evidence.

5. SAME—*Conclusions of Witnesses Drawn from Certain Facts Competent.* Facts which are made up of a great variety of circumstances and a combination of appearances that cannot be fully described, such as excitement, grief, despondency and the like, may be shown by the opinion of ordinary witnesses whose observations are such as to justify it.

6. SAME—*Certain Competent Written Evidence Erroneously Excluded.* When a writing proper to be received in evidence is properly identified by a witness, it is error to exclude it for the reason that another person in the court room who may be called as a witness could also identify it.

7. SAME—*Limitation as to Number of Impeaching Witnesses.* The court should not make an unreasonable limitation as to the number of impeaching witnesses. In this case it was error to limit the number to five.

8. SAME—*Erroneous Instructions as to Comparative Weight of Circumstantial and Positive Evidence.* An instruction which places circumstantial evidence on a higher plane than positive evidence, and which indicates that it may be used only to establish guilt, is erroneous.

9. SAME—An instruction that positive evidence should be given greater weight than negative evidence, is erroneous when its only effect is to support a fallacious view of specific portions of the evidence.

10. SAME—*Relatives of Deceased Witnesses for the State—Instruction Stating the Law of Inheritance Should Be Given if Requested.* When a husband is on trial charged with the murder of his wife, who left an estate, and the parents and other immediate relatives of the deceased are witnesses for the state, an instruction stating the law of inheritance, in the event of a conviction or an acquittal, should be given, if requested, as having a bearing upon the interests of the witnesses in the result of the case.

The State v. Scott.

Appeal from Linn district court; EDWARD C. GATES, judge. Opinion filed December 6, 1924. Reversed.

*Charles F. Trinkle,* of La Cygne, and *John A. Hall,* of Pleasanton, for the appellant.

*Charles B. Griffith,* attorney-general, *William A. Smith,* assistant attorney-general, and *W. W. Edeburn,* county attorney, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: John Ellison Scott, charged with the murder of his wife on June 19, 1923, was found guilty of murder in the second degree, and he has appealed. The story disclosed by the record is substantially as follows:

Ellison Scott, as appellant is commonly known, was reared on a farm, and when nineteen years of age was married to Ella (Holt) Scott in 1911. No children were born to them. They lived on the farm a few years, then moved to La Cygne, where Ellison Scott worked in a store for about three years, and during this time his wife, Ella Scott, worked in a store for about a year and a half. Then with $3,000 which his father let him have and money he and his wife had saved they bought a grocery store and meat market, which they operated about four years and were operating at the time Mrs. Scott was killed. Both worked in the store, and they employed some help; Mr. Clyde McCullough worked for them some time; then Mr. T. R. Peters was employed in the meat department. He quit early in 1923, and McCullough was again employed. In the spring of 1923 Ellison Scott and McCullough formed a partnership to conduct a retail ice business, with McCullough as manager, at a place away from the store, and this was continued until the tragedy. Perhaps they employed other help at the store at times.

Nearly four years prior to the tragedy, Arlene Scott came to live with Mr. and Mrs. Ellison Scott while attending high school. Her mother is a sister to Ella Scott, but her father, Clarence Scott, is not related to appellant, though having the same surname. Arlene's parents lived in the country some twenty-five miles from La Cygne, where there was no high school. Arlene spent the summer months at home and the school year at the home of her aunt and uncle, Ella and Ellison Scott. While there she attended school, helped Ella Scott with the housework and helped in the store on Saturdays. She graduated from the high school in May, 1923, and went to Pitts-

burg to attend a summer session of the State Teachers College, and was there at the time of the tragedy.

The Scott home was in the residence part of La Cygne, several blocks from their store, which was in the business part of town, and is situated on the southwest corner of the block. The main part of the house is a story and a half; it faces south, where there is a front porch and door; the west room downstairs was used for a bedroom, and in it was a cedar chest; the east room was the living room, into which the front door opened, and having a window east of the front door on the south; from the main part of the house there is a one-story extension north, which is fourteen feet wide and possibly twenty-four feet long, making the foundation for the entire house in the form of a T. This extension was divided by a partition so as to make a narrow room on the north which was used for a kitchen, and the remainder fourteen by seventeen feet was used as a dining room. Along the east side of this extension is a cement porch, seven feet wide. There is a door on the west of the dining room, where there is just a step and then the lawn; there is a door on the east of the dining room onto the porch, also a door from the kitchen onto the porch, a door between the kitchen and the dining room, and a door from the dining room into the living room. The dining room is lighted by two drop electric lights which turn on by pulling a cord near the lights. One of these was north and east of the central part of the ceiling. The dining table was set against the east side of the dining room north of the door leading to the porch, and a couch was on the west side of the room. On the east side of the cement porch vines were growing so as to cover the side of the porch from the ground to the ceiling, except directly in front of the door from the dining room. Just to the northeast of the north end of the porch is the cistern; there is a cement walk from the north end of the cement porch north to a toilet and coal house near the alley, and from this walk a few feet south of the outbuildings a walk extends at right angles west to the garage, which is on the rear of the lot near the west side and is entered with a car from the street on the west. The Scotts had a seven-passenger Studebaker touring car, which both of them drove and which was kept in the garage when not in use. There is lawn south and west of the house and extending around north to about ten feet east of the cement walk. There were several large maple trees in the yard to the south and west of the house. Northeast of the house is the

garden with flowers and shrubbery about it and along the alley east
of the outbuildings.

Directly across the street south of the Scott home lived Reverend
Molesworth, the Methodist minister, and his wife. Reverend Han-
son, the district superintendent, was there the evening of the tragedy.
East of them in the same block P. D. Leivy and wife lived, their
house facing north. Directly across the street west of the Scott
home in a house facing to the east and south lived Mr. Carnagey
and wife and two grown daughters, teachers, one an instructor in
the State Teachers College at Pittsburg, a son-in-law, Herschel
Helms, his wife, and a grand-daughter, Wilma Strahl. West of
Carnageys' in the same block, their house facing south, lived Clyde
McCullough and wife, and directly west of McCulloughs', across
the street, Doctor Morrison and wife lived. West of Reverend
Molesworth across the street, the house facing north and east, I. N.
Rowley lived with his wife and daughter, Laura Rowley, who is a
stenographer in one of the banks at La Cygne; and west of Rowleys'
in the same block, the house facing north, L. P. Bishop, president of
the other bank in La Cygne, lived with his wife. There was a street
light on the Scott corner which was not at the middle of the inter-
section but on a pole near the southwest corner of the intersection.
Some of these people had retired for the night at the time of the
tragedy, others had not, but all of them heard the shots and Scott's
calls for help. All of these people had lived in their respective homes
several years and were well acquainted with the Scott family.

Barring two instances, which will be later mentioned, there is no
evidence of any discord or lack of harmony between Ellison Scott
and his wife. They worked together in the store and usually went
together back and forth from their home to the store. When Ellison
Scott worked about the yard, garden or garage, his wife was fre-
quently with him; they took trips together with other married
people; to the Ozarks for a summer outing; to the Free fair at To-
peka; to visit relatives and other places, and they went together to
church and to other public meetings and entertainments. He usually
spent his evenings at home or in her company. In short, generally
speaking, the evidence of all of their neighbors is that they were
respected, industrious, and exceptionally congenial people. The
relationship between them and Arlene appeared like that of parents
and daughter. Arlene took private lessons in reading from a neigh-
bor, Mrs. Leivy, and the last year she was with the Scotts she joined

the Methodist church.  About ten days before the tragedy she spent the week end with her aunt and uncle, and some of the neighbors were in for a Sunday dinner.

On the night of the tragedy, June 19, 1923, there was a tent show at La Cygne which was attended by many people from the town and country about.  It was a fun-making entertainment; Ellison Scott and his wife were there and appeared to enjoy it as others did.  The show was out about 10:30; Scott and his wife went to their car which was parked near the tent and there visited a few minutes with friends whose car was near theirs.  They then drove by the restaurant where they stopped and ate ice cream and drove home.  Neighbors saw them drive east to the Carnagey corner where they turned north and into their garage.  A few minutes later, some estimate the time at ten minutes, two shots were heard by people in that neighborhood, perhaps a second apart, and a dog was heard to bark about the time of the second shot or a little later.  Some witnesses living a block or more from the Scott home heard the scream of a woman between the shots; some said the scream was "cut off" by the second shot; other witnesses nearer by did not hear that.  About a minute after the shots Mr. Leivy, who by that time had gone to his north door to look about to see if he could discover what caused the shots and the dog to bark, looked across to the Scott home.  The blind on the south window of the sitting room of the Scott house was down only about half way.  Through this window he could see through the sitting room into the dining room of the Scott home, where there was a light, and there saw Ellison Scott rush across the dining room to the west side, then back in a stooped position; heard him helloa or call; thought he distinguished the words "My God, Ella help me"; then Scott moved quickly to the west side of the room.  Leivy turned and spoke to his wife about what he saw and hurried across toward the Scott home, and heard a commotion west of the Scott house.  The Carnageys heard his call for help while Scott was in the house, but heard it more distinctly after he went out the west door.  Scott was then running west, calling loudly, "Folks, come quick, Ella is shot."  "My God, help," and similar expressions.  He ran west south of the Carnagey house, and Scott said, "Herschel, come quick."  Helms asked if he had a gun; Scott said, "No, but go over anyway."  Scott kept running west.  He called to Clyde

The State v. Scott.

McCullough and told him Ella was shot, and repeated calls for help and to come quick. At some time while running west along that block, either in answer to a question from Helms or McCullough as to where he was, or from his own volition, he stated he was in the garage. About the time he got south of the McCullough house he called for the doctor, "Oh, Doc, Ella is shot; come quick." Dr. Morrison heard his call, jumped into his Ford sedan and drove rapidly to the Scott home. Scott saw him go and turned and ran back toward his home, but continued to make exclamations not addressed to anyone in particular, one being "I don't think she will ever speak again." Doctor Morrison saw a light in the Scott garage and first went there; seeing no one, he hurried to the house and went into the dining room from the west door. Leivy, Helms and Reverend Molesworth were there, and other neighbors came soon. Leivy and Helms were the first to get to the house. They went to the south front door; the screen was hooked; one ran around the house to the west, the other to the east, and they entered the dining room about the same time. Mrs. Scott was lying in the dining room on the floor almost directly under the north light which was burning, her head to the south, almost on her back, slightly on her right side. Doctor Morrison went to her, felt her pulse, which was very weak, observed her countenance, pulled the dress down from the neck and saw a bullet wound in her right breast, which he thought would not cause death, and hastily gave her a hypodermic. He examined more closely and found a bullet wound in the left breast. While he was working with her Scott came in, went to his wife, and was making exclamations asking the doctor to help. Either of his own volition, or at the suggestion of someone, he took a chair and sat near the east dining room door, facing the doorway. He had his face in his hands, and made exclamations as to himself. Some of them were: "O, if I had only come in with her"; "My God, what will I do"; "O, if I had only come in the house first." At one time he asked, "Has Doc come yet?" Someone said, "Yes, the doctor is here." He said, "What did Doc say?" Someone told him the doctor had not said yet. Ella Scott did not speak after any of the neighbors or the doctor reached there, and died in about five or seven minutes. The doctor went over to Ellison Scott, put his hand on his shoulder and said, "Ellison, Ella is gone." Scott replied, "My God, Doc,

don't tell me that." The doctor told him, yes, she is gone, and asked him to brace up and tell what he knew about it. He did compose himself somewhat, and said in substance that when they drove into the garage the clutch on the car had been giving some trouble by sticking. His wife had called his attention to it, and he had noticed it. It was a trouble that had happened before to the car. His method of treating it was to block the clutch open, pour a light oil, gasoline or coaloil, on it, let it stand over night or several hours, then put neat's-foot oil on it; that he had two short pieces of 2 x 4 in the garage for the purpose of propping the clutch open; that after driving into the garage that night he stayed in the garage for the purpose of doing that, and his wife had gone into the house; that he had propped the clutch open, raised the hood of the car, got the oil can and was stooped over with his head partially under the hood pouring oil on the clutch, when he heard the shots; that he was not sure of the direction from which they came; that he set the oil can down on the sill of the car and went to the west door of the garage and looked up and down the street, but saw nothing; that his wife usually went to the door at any disturbance; that he looked towards the house and did not see her come to the door; that he then walked back through the garage and along the cement walk into the kitchen and then into the dining room and saw her lying on the floor; that he spoke to her, tried to raise her; that she did not speak; that he noticed the bullet wound and realized his wife had been shot; went to the west door and called for help; went back to his wife, spoke to her; she did not answer, but he noticed that she breathed; he then went out the west door, having to take time to unhook the screen, called for help and ran for the doctor. (And this was his testimony on the witness stand.) Ellison Scott appeared to be greatly depressed and exhausted, and continued to sit in the chair by the door for some minutes. Mr. Carnagey then took him by the arm and said he better go over to his house, and as they went out of the house McCullough took him by the other arm and together they took him over to Carnagey's house, where he lay on a bed and continued to moan and cry and to make exclamations as to himself. After Mrs. Scott was pronounced dead she was taken up and laid on the couch. Mr. Bishop, Mr. Helms and others present immediately started an investigation of the premises. The mayor and county

The State v. Scott.

officials were notified. In the bedroom down stairs on a chair near the cedar chest was found a pile of boxes of silverware, such as a berry spoon, knives and forks, etc. It was not noticed that any of the bureau drawers had been pulled out or ransacked. The screens were examined, but no holes were found in them. Mrs. Scott's nose glasses, which she usually wore, and her purse were on the dining table. The cement porch east of the dining room was lighted by an electric light in the ceiling which was switched on by a switch in the wall, and while Mr. Bishop and Mr. Helms were investigating about the porch, one of them snapped the switch but the light did not turn on; then he snapped it again and it did not turn on. He reached up and screwed the light bulb in and it lighted. Someone asked Mr. Scott if he knew who had screwed the bulb out, and he said "No." In the dining room on the floor near the threshold of the door from the kitchen was found an empty .32 automatic shell. Another shell was found on the floor of the dining room near the east wall under the dining table. Near the north end of the cement porch and near the cistern was found a loaded shell, and between the cistern and garden a second loaded shell was found; all were .32 automatic Peters shells. At the garage they found the garage lights on, the car clutch propped open with 2 x 4's, the hood raised on the right side, and an oil can containing coal oil sitting on the frame of the car. In the garden were found tracks of a man, also of a woman, and nearby weeds pulled recently but long enough for the dirt on the roots to dry. The tin spout or pipe leading from the guttering on the porch to the cistern was dented or marked as though some one had struck it with his foot, or stepped on it. The gun or pistol with which the shots were fired was not found, though a thorough search of the premises was made that night and the next day. Even the cistern was drained. The coroner reached there about five o'clock in the morning. An examination of the body disclosed two bullet wounds, one in the left breast directly to the right of the left nipple; this went directly through the body; the bullet was taken out on the back from just under the skin. This wound passed close to the base of the heart and caused death. The other bullet wound was in the right breast directly above the right nipple an inch and a half; it ranged upward; the bullet was not located. This wound would not have caused death unless infection developed. There

was also a bullet wound through the fleshy part of the left hand, near the base of the thumb, entering from the back of the hand and coming out through the palm. There were no powder burns on the clothing or flesh. The sheriff and other officers arrived early the next morning, and the sheriff talked to Scott. Earl Cox, a brother-in-law to Ella Scott, talked to Ellison Scott the next morning, and to Cox Scott told the story about being in the garage oiling the clutch of his car, but said after he heard the shots he went to the west door of the garage and after looking about he went to the house across the lawn to the north end of the cement porch. The night of the tragedy one of the Carnagey girls telephoned to Arlene, at Pittsburg, and she came to the Carnagey home, reaching there at five o'clock in the morning. Ellison Scott and Arlene Scott stayed at the Carnagey home till after the funeral on Friday. The tragedy attracted many who came to the Carnagey home, which seemed to be rather a headquarters for the curious as well as the officials inquiring about the matter. After the funeral Scott was arrested, charged with the murder of his wife.

In addition to his plea of not guilty, the defendant offered evidence which, as he claims, tends to show that the homicide was committed by an intruder possibly fearing identification who was in the house when Mrs. Scott went in and turned the electric light on. In support of that theory attention is called to the evidence of the congenial relations between Scott and his wife; that the searchers that night found the garage light on, the car clutch propped open, the hood raised on one side and the can of coal oil sitting on the frame of the car, indicating the correctness of Scott's statement that he was in the garage oiling the clutch when he heard the shots; that the gun or pistol with which the homicide was committed was never found, though a thorough search was made for it, and under the evidence it was practically impossible for Scott to have hidden it successfully after the shots were fired; that the best silver, in boxes, was found piled on a chair in the bedroom; that the screen on the east dining room door, usually kept hooked, was unhooked when Leivy entered that door; that the electric-light bulb on the porch had been screwed out while the light was snapped on; the two loaded cartridges found, one near the cistern and one between the cistern and the garden, indicating that the murderer either entered or left the house by way of the garden; the indentation in the spout to the cistern indicated that some one not familiar with the premises had struck his foot

The State v. Scott.

against it or stepped on it in a hasty exit; the garden is in the shade of the house from the street light, and the shrubbery about the garden would enable one to get away from the house in that direction without being observed from the street or any neighboring house. Defendant offered to show that the house had been burglarized a short time before; that on the night of the tragedy and within a short time, not more than five minutes, after the shots were fired Laura Rowley at her home saw a man going west on the sidewalk just north of her house. She had a good view and description of him; it was not Mr. Bishop, whom she knew. She asked this man what was the trouble, and he pointed over to the house and said a woman had been killed over there. Her father, I. N. Rowley, saw this man and heard the conversation. A few minutes later about four blocks from the Scott home and in the direction of the stockyards a Mrs. Enloe had stepped out on her porch, which was near an open but unused street, and turned on the porch light and saw a man running past her house in the direction of the stockyards. She was able to get a fair description of him. A little later in the evening a freight train passing through the town slowed down near the stockyards. A man was seen on the train directly afterwards, was ordered off by the trainmen, whom he threatened, and he was told to get off at the next stop. The trainmen got a good view and description of him. The next stop was Pleasanton, and he did get off there. That each of these witnesses reported the matter promptly to the county officials, and were later shown a picture of Fred Slavens, whom each of them recognized as the man they saw. Fred Slavens' home was at Pleasanton; he was notorious in that he had been several times prosecuted and convicted and served time in the penal institutions both of Kansas and Missouri for burglary, larceny and similar offenses. The court excluded all of this offered evidence, and complaint is made of that ruling. The evidence should have been admitted.

When one is charged with a crime, and the prosecution relies upon circumstantial evidence for his conviction, the defendant is entitled to show as a part of his defense circumstances reasonably tending to show that another committed the crime.

Wigmore on Evidence, vol. 1, 2d ed., discusses the matter thus:

"§ 139. If X is charged with homicide, committed by himself alone, and it is shown in disproof that Y did the killing, X is clearly exonerated for the fact

that Y has done it is inconsistent with and exclusive of X's guilt: There are, of course, cases in which X is by hypothesis in some way an accomplice of Y, either at a distance or as a personal sharer; and there is even the rare case of independent and double felonious acts upon the same object. To such cases the argument cannot apply. Apart from them, it is as cogent as an alibi. If the Man with the Iron Mask was the Duc de Vermandois, he could not have been the General de Bulonde; and if the Tichborne claimant was Arthur Orton, he could not have been Roger Tichborne. The question that arises, from the point of view of the rules of evidence, is whether, in evidencing this doing by a third person as a fact of disproof, any unusual requirements should be made as to the strength of the evidence before it can be admitted. Thus, to prove A guilty of murder, evidence of his threats (i. e., a design) to commit it are always admissible; now, if the fact to be proved is that B committed the murder (as inconsistent with A's guilt), why should not B's threats be admitted, without further restriction, as A's are? It is true that evidence of B's threats alone would not go far towards proving B's commission; but it is not a question of absolute proof nor even of strong probability, but only of raising a reasonable doubt as to A's commission; and for this purpose the slightest likelihood of B's commission may suffice or at least assist. The evidence of B's threats, to be sure, may, in a given instance, be too slight to be worth considering but it seems unsound as a general rule to hold that mere threats, or mere evidentiary facts of any one sort, are to be rejected if unaccompanied by additional facts pointing towards B as the doer. Nevertheless, most courts have shown an inclination to make some such restriction, and to insist that two or more kinds of evidentiary facts pointing towards B must be offered, and that one kind alone will not be received. It is difficult to see the object of this restriction, because if the evidence is really of no appreciable value, no harm is done in admitting it while if it is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic, but should afford the accused every opportunity to create that doubt. A contrary rule is unfair to a really innocent accused.

"§ 140. *Threats* are perhaps the commonest kind of evidence offered for this purpose. The rulings differ widely in their effect; but in general a wholly unnecessary strictness is shown, and the illiberal attitude of some courts in this respect towards accused persons is in singular contrast with the maudlin tenderness otherwise often exhibited.

"§ 141. A *motive* as evidence is perhaps not of such value as a threat yet courts seem more inclined to receive it. There is no reason for requiring that it be coupled with other evidence in order to be admissible."

Turning to the case we find quite a variety of holdings.

In *Taylor v. The State*, 81 Tex. Crim. Rep. 359,364, it was said:

"In cases depending upon circumstantial evidence, 'the mind having nothing to rest upon seeks knowledge and light from every source.' (*Dubois v. State*, 10 Texas Crim. App., 250.) Every reasonable hypothesis should be explored, and evidence which tends to show that another and not the accused committed the offense, or which may create in the minds of the jury a reasonable doubt as

The State v. Scott.

to the identity of the slayer, or which presents a hypothesis which is inconsistent with the guilt of the accused or consistent with his innocence, should not be rejected by the court because the circumstances pointing to the accused on trial are more numerous or more cogent than those pointing to others." (p. 364.)

In *Ballou v. Humphrey,* 8 Kan. 219, it was held:

"Where a plaintiff attempts to prove a material fact by circumstantial evidence, it is competent for the defendant to disprove the same by circumstantial evidence; and it is not necessary that the evidence of the defendant be of as high an order or as conclusive as that of the plaintiff. If it tends to disprove such fact, it is competent if otherwise sufficient." (Syl.)

Many of the courts hold that where one is charged with murder committed by one person, and the defendant denies the killing and offers evidence tending to show that the crime was or might have been committed by another, it is not sufficient to show that the other was present in the neighborhood or that he fled from the community or that he made an unsworn confession, or to show that he made threats, or that he had a motive, but that when any of these is shown together with other evidence which tends to connect him directly with the homicide itself, then the evidence is competent. (*Walker v. The State,* 139 Ala. 56; *McElroy v. State,* 100 Ark. 301; *Tillman v. State,* 112 Ark. 236; *People v. Mitchell,* 100 Cal. 328; *Synon v. The People,* 188 Ill. 609; *Green v. State,* 154 Ind. 655; *The State v. Beck,* 73 Iowa, 616; *Etly v. Commonwealth,* 130 Ky. 723; *State v. Dyer,* 154 La. 379; *Commonwealth v. Abbott,* 130 Mass. 472, 473, 475; *Irvin v. State,* 11 Okla. Crim. 301; *State v. Myers,* 12 Wash. 77; 30 C. J. 159, 166, 167, 168.)

And in such a prosecution where the state relies upon circumstantial evidence to convict the accused, the courts as a rule are much more liberal in receiving evidence of threats, motive, presence in the vicinity, flight, or confession, and circumstances tending to connect the third person with the offense, than in cases where there is direct evidence against the accused. It seems sound reasoning to say that in a case where the state relies upon circumstantial evidence to connect the accused with the crime, that the defendant who contends that the crime was committed by a third party and shows threats, motive, presence in the immediate vicinity at the time of the homicide, flight, or confession of such third person, might also rely upon circumstances tending to connect such third person with the crime. In other words, the defendant ought not to be made in a given case to make a higher degree of showing with respect to the

third person than the state is required to make with respect to the accused. But in this case we need not resort to refinements of reasoning to determine the admissibility of defendant's evidence. If the rule is followed as stated by Wigmore, *supra*, and *Taylor v. The State*, supra, there is no doubt of the admissibility of this evidence. If tested by the rule that there must be two kinds of evidence instead of one, we think it admissible. The third party was so near the scene of the homicide so soon thereafter, his identification and his previous history tend to show motive, his flight was shown, and the evidence admitted would bear the interpretation that one unfamiliar with the premises entered or left the place by way of the cistern and garden. So if two or more kinds of evidence are necessary to be produced, that offered comes within that rule.

Counsel for the state after discussing this matter and citing authorities say:

"The decisions which hold that a defendant may introduce proof pointing to the guilt of a third person all say that it must be legal evidence, which undoubtedly must mean that the evidence must be evidence which would be admissible against the third person in case he were on trial."

Tested by that rule the evidence was unquestionably admissible, for had Fred Slavens been on trial charged with this crime there is no doubt of the admissibility of this evidence.

The conclusion reached requires a reversal of the case, but it will be necessary to discuss some of the other questions presented that may again arise on another trial.

In addition to evidence pertaining directly to the homicide the prosecution undertook to show a motive of defendant to murder his wife. Much of the time of the trial was taken up with this branch of the case.

It is the theory of the prosecution that Ellison Scott had fallen in love with Arlene, that he had been unduly intimate with her, and that he murdered his wife to get her out of the way. As tending to support that, it was brought out that Arlene had developed into a handsome, capable young woman. A few incidents prior to the tragedy were relied upon. The earliest of them was testified to by Gus Clark and his wife, which in substance is this: About eleven months before the tragedy there was a social gathering at the home of Mr. Rogers (Mrs. Rogers and Ella Scott were sisters), about twenty miles from La Cygne one Sunday afternoon, at which several married couples were invited; the refreshments were ice cream and

The State v. Scott.

cake; Ellison Scott and his wife and Arlene were there; Gus Clark and his wife were there. All the people there were well acquainted. They were visiting, cutting up and having a good time; some of them in the dining room eating refreshments, some in the sitting room with the door open between. Clark and his wife were in the sitting room; Ellison Scott and Arlene were there sitting on the floor near the window. "They were scuffling and tickling one another and he was grabbing ahold of her knees," and a little later they were scuffling and he had his arms part way around her.

·Another incident as testified to by Mr. Peters. About six or seven months before the tragedy, Peters was then working for Ellison Scott as a meat cutter; for some reason Ella Scott had acquired a dislike for Peters, and for a week or more had not spoken to him. On a Sunday morning Mrs. Scott came to Peters' home; she was crying. Peters went with her to the Scott home; there were Ellison Scott and Arlene; Arlene took no part in the conversation but was crying. The witness described what took place:

"Well, we went in the house, and Mrs. Scott said, 'Are you still mad,' and something and I don't know the exact words, but I will give it as near as I can, and so he says, 'Well, how are you feeling,' and she said, 'Ellison, you are· not treating me right,' and Ellison said, 'Ella, I have done all I could for you and bought you everything I can', and that he bought her dresses and such as that, and he said, 'I went as far as I could, everything you asked for'; and she said, 'I know that is true, Ellison,' but she said 'you crush me down and I can't do nothing,' and she also showed a blue place on her here and on her arm where he crushed her, and that is about all that I paid much attention to."

"Q. Refreshing your recollection, was there anything said about 'If you had caught me in the shape I caught you, you would kill me'?

"A. Yes, sir, she did say that—let's see how was that, 'If you caught me in the position I caught you in, you would kill me.' "

Another incident as testified to by Leona Rogers, a niece of Ella Scott's: A short time before Arlene's graduation in May, 1923, Scott, his wife, and Arlene were visiting at the home of Arlene's parents one Sunday. After dinner, Arlene, whose father did not have an automobile, asked Ellison Scott if he would take her to see the members of the school board to try to engage a school. Ella Scott looked rather angry. Ellison Scott went over and had a private talk with her a few minutes. After that Ella Scott was not jovial as usual, but they did get in the car and all of them went to look for a school for Arlene. Ella Scott rode in the front seat with her husband. In the back seat were Arlene, her father, brother and Leona Rogers. Arlene stated to Leona while they were riding, re-

ferring to Mr. and Mrs. Scott, that they had a little trouble between them at this time, and further stated it was just like living in hell over there. The witness thought that both Ellison Scott and his wife turned and looked back as though they had heard the remark.

Another, as testified to by Sarah Holt, mother of Ella Scott: After Arlene graduated Ellison and Ella Scott took her to the house of her parents, and went by and took Mrs. Holt. As they started home that evening "Ellison asked Arlene back, but Ella didn't ask her back to La Cygne."

The state offered in evidence a letter known in the record as "Exhibit G," written by Ella Scott to her mother, Mrs. Holt. It is not dated, but is evidently before school was out in May, 1923. For the most part the letter was a chatty letter such as a daughter would write to her mother, but contained the following paragraph:

"Well school will soon be out, and I'll be glad. Arlene is getting homesick; don't know how she will stand it to go to school. But I won't have to worry about her anyway. Believe me, she sure gets on our nerves sometimes. Don't say anything about it to anyone. But she sure won't mind a thing hardly we want her to do. But thank goodness it will soon be over.

"Well, I'll quit and get to work. Write when you can.

"We will be down some time next summer ha ha.

"Burn this up.
                                        "Love to all,
                                            ELLA."

The state also relied upon some instances which occurred after the tragedy which will be now noted. There was some evidence tending to show familiarity or jocularity between Ellison Scott and Arlene on a few occasions during the days they were at the Carnagey home before the funeral. And on the day of the funeral, when the relatives were getting ready to go home, Ellison Scott called Arlene and her mother and Mrs. Stephens, a sister to Arlene's mother, into the parlor, and asked Arlene to stay in La Cygne, but her mother objected.

On July 18, 1923, Ellison Scott stopped off the train at Pittsburg, where Arlene was attending school, called her by telephone, had her go with him to a hotel where he registered for both of them as "James Bowman and wife, Kansas City." They were assigned a room which they occupied for two or three hours in the afternoon. After they left the bed in the room showed it had been occupied on one side only and one pillow had been used; the towel in the room was damp at one end and there was a soiled handkerchief on the floor.

The State v. Scott.

A witness, Ed S. Lee, a prisoner in the county jail, where Ellison Scott was incarcerated on July 29, 1923, testified that he had a conversation with Scott in the jail a day or two later, in which Scott told him, in substance, that he, Scott, had sexual intercourse with Arlene at Pittsburg, and that he had previously had sexual intercourse with Arlene at La Cygne.

Timely and proper objections were made on behalf of defendant to the evidence concerning each of the incidents and transactions above mentioned and relied upon by the state. The objections were overruled, and these several rulings are assigned as error.

When a husband is being prosecuted for the murder of his wife and the prosecution undertakes to show that the accused's motive was his intimacy with and infatuation for another woman to the extent that it destroyed his natural love for his wife and created within him a desire to get rid of her, the well established rule is that trouble between the husband and wife prior to the homicide and continuing up to that time, and any evidence which legitimately tends to show improper relations with the other woman, either before or soon after the homicide, is competent, but incidents which do not legitimately tend to show such facts, and which could not be construed to do so except by pure speculation, should not be admitted. (*The State v. Reed,* 53 Kan. 767, 773, 37 Pac. 174; *Weyrick v. The People,* 89 Ill. 90; *State v. Sprouse,* 177 S..W. 338 (Mo.); *State v. Shoemaker,* 183 S. W. 322 (Mo.); *St. Louis v. The State,* 8 Neb. 405; *People v. Harris,* 209 N. Y. 70; 30 C. J. 184, 185.)

Without discussing in detail the several incidents above mentioned, but applying to them the rule just stated, we hold that the evidence concerning the incident testified to by Gus Clark and wife, and that testified to by Sarah Holt, and plaintiff's exhibit "G" should not have been admitted; as to the other incidents, the court's rulings admitting the evidence were correct. Appellant calls our attention to explanations of some of those incidents, and to evidence tending to discredit others, but these are questions which go to the weight of the evidence and must be passed on by the jury. We purposely refrain from expressing any view as to the weight which should be given to the evidence pertaining to these incidents.

As tending to disprove the intimation that Arlene was intimate with Ellison Scott, the defendant offered to prove that Arlene Scott kept company regularly with a young man during the last two years Arlene lived at the Ellison Scott home, and that on the occasion of

the week-end visit of Arlene to the Ellison Scott home, about ten days before the homicide, this young man spent Friday and Saturday evening with Arlene at the Ellison Scott home. This offer was refused. The evidence should have been admitted.

A witness called by defendant, Mrs. Leivy, testified that on the evening after the homicide she was at the Carnagey home in the sitting room where several were, that Ellison Scott and Arlene were sitting on the couch and both were crying; that Arlene put her arms about Mr. Scott's shoulders and they both cried. The state objected to this as self serving, and the court struck it out. The ruling was erroneous; the state had undertaken to show familiarity or jocularity on the part of Ellison Scott and Arlene while at the Carnagey home, and defendant was entitled to rebut such showing.

The defendant offered in evidence certain letters that were written either to or by Arlene Scott. The writing was properly identified by a witness then on the stand. They were objected to because Arlene Scott was then in the court room, and the objection was sustained. It should have been overruled. If an instrument competent to be received in evidence is properly identified by one witness, it is no objection to its introduction that another person who might be called as a witness could also identify it.

Appellant complains that on several occasions during the progress of the trial counsel for the prosecution, and on one or two occasions the court, called attention in the presence of the jury to the fact that Arlene Scott was in the court room, and commented on what would or would not be competent evidence if the defense called her as a witness. These references should not have been made; they smack too much of a stage play as distinct from a judicial inquiry. She had been subpœnaed by the state but was not used as a witness by the prosecution. An information charging her with the murder of Ella Scott was then pending in the same court. Under those circumstances there may have been valid reasons why the defense could not call her as a witness other than that which the state assumes to deduce from that fact. Then the state should rely for conviction upon evidence produced in court, and not depend upon deductions which it presumes to draw from what a witness, subpœnaed but not used by it, might or might not have testified to if put on the witness stand by the defendant.

Appellant complains that the court excluded evidence of grief. By many witnesses it was attempted to be shown that the nature of

The State v. Scott.

defendant's calls for help and for the doctor were from their tone, volume and the manner in which they were given, genuine calls for help which were calculated to and did arouse the entire neighborhood, and that his exclamations addressed to no one in particular, his manner, countenance, general appearance and demeanor indicated grief and extreme sorrow to the extent that overcame and incapacitated him for the time being and practically throughout the night. Questions designed to elicit the facts relative to this matter were objected to as calling for conclusions. These objections were sustained and the witnesses were asked to state what they saw and heard that the jury might form its own conclusions. This ruling was erroneous. The witnesses should describe what they saw and heard as accurately as possible, but these matters can be described in part only by the witnesses stating what they saw and heard; they must be described by statements somewhat in the nature of conclusions.

In *The State v. Baldwin,* 36 Kan. 1, 10, 12 Pac. 318, it was said:

"Facts which are made up of a great variety of circumstances and a combination of appearances, which, from the infirmity of languages, cannot be properly described, may be shown by witnesses who observed them; and where their observation is such as to justify it, they may state the conclusions of their own minds. In this category may be placed matters involving magnitude or quantities, portions of time, space, motion, gravitation, value, and such as relate to the condition or appearance of persons and things (*City of Parsons v. Lindsay,* 26 Kan. 426; *The State v. Folwell,* 14 id. 105.) On the same principle, the emotions or feelings of persons, such as grief, joy, hope, despondency, anger, fear, and excitement, may be likewise shown; and hence the testimony objected to was properly admitted. (Lawson's Expert and Opinion Evidence, rule 64; 2 Best on Ev., § 517.)"

Ed S. Lee was not present at the trial, and his testimony given at a former trial was read. To this the defendant objected for the reason that diligence had not been shown to subpoena him for this trial. At the time of trial he was residing and working in Missouri and refused to accept service and appear as a witness. The state could not compel his attendance, and it was entitled to use his former testimony. (*The State v. Nelson,* 68 Kan. 566, 75 Pac. 505; *The State v. McClellan,* 79 Kan. 11, 13, 98 Pac. 209; *The State v. Stewart,* 85 Kan. 404, 413, 116 Pac. 489.)

The defendant undertook to impeach Lee. The first witness called for that purpose, after testifying that he knew the general reputation of Lee for truth and veracity in the vicinity in which he lived and that it was bad, was asked if he would believe Lee under oath.

The court sustained an objection to this question. This ruling was erroneous. (*The State v. Johnson,* 40 Kan. 266, 19 Pac. 749.) When the defendant called its sixth witness on the impeachment of Lee, the court stopped the examination with the ruling that defendant had exhausted the number of witnesses on that question. No rule had been previously announced on that question. The defendant complains of this ruling; it was erroneous. The number of impeaching witnesses that may be called by a party rests in the sound discretion of the trial court and his ruling thereon will not be disturbed unless it is clear that discretion has been abused. What number should be permitted depends upon the nature of the case on trial and the importance of the testimony of the witness sought to be impeached. In a murder case, where general previous good character of defendant was sought to be established, a question not seriously contested, a rule announced at the beginning of the trial limiting the number of witnesses on that question to ten was approved as being within the discretion of the court in *The State v. Elftman,* 116 Kan. 214, 230, 226 Pac. 795. But here the testimony of Lee was the most important evidence the state produced on the motive branch of the case; the only direct evidence of sexual intercourse between defendant and Arlene, either before or after the homicide. It was the testimony which makes competent evidence concerning the Pittsburg incident, and generally speaking it is the key to all the evidence of any consequence on the motive branch of the case. Lee's testimony contained within it matter which defendant claims tends to weaken it. It was denied by defendant. Considering the testimony itself, its importance, and all the circumstances in connection with it, the defendant should have had practically an unrestricted opportunity to discredit it. It was error to limit the impeaching witnesses to five.

Some questions are raised about the instructions. The court should have defined the word "motive," since he was requested to do so. As the instructions stood, they were open to the interpretation that if the jury believed the defendant was intimate with Arlene that would constitute a motive for the homicide. But that is not necessarily true; a man might be intimate with another woman and still have no desire to kill his wife.

Complaint is made of giving instruction No. 20, which reads:

"The court further instructs you, that positive testimony of witnesses that they heard certain sounds will outweigh the negative testimony of witnesses

that they did not hear such sounds, provided the witnesses are equally credible, but in connection with this instruction should be considered the relative means or opportunity of the several witnesses to hear such sounds."

It may be doubted if this is a good instruction to give in any case (1 Wigmore on Evidence, 2d ed. § 664, note p. 1070; 23 C. J. 40-45; 16 Cr. App. Rep. 49), but we shall not determine that now.   Its application in this case, as argued by counsel on both sides, is to the question of whether there was a scream of a woman between the two shots.   The state argues that five witnesses for the state, who were a block or more from the Scott home, heard the scream of a woman between the two shots; hence Ellison Scott must have heard it, but he testified that he did not; hence his testimony was false, and the jury were justified in disbelieving his testimony about being in the garage when the shots were fired.   This argument is fallacious. The five witnesses referred to are Mrs. Bishop, who lived a block west and across the street from the Scott house, Mrs. Rhynerson and her two daughters, who lived a block east and across the street, two of whom said they heard the scream between the two shots, and one said she heard, soon after the second shot, what she thought was a scream, and Rosie Wilkerson, who was three blocks north of the Scott home.   Now, assuming that these witnesses did not mistake the barking of the dog for a scream, and assuming that what they heard was the scream of a woman, then it necessarily follows that there was a scream of a woman at that time; but it does not necessarily follow that the defendant testified falsely when he said he did not hear it.   Mr. Bishop, who was at the house with Mrs. Bishop at the time, Mr. McCullough, Doctor Morrison, and Mr. Leivy, all called as witnesses for the state, and Mrs. Leivy, Reverend Molseworth and wife, Mr. and Mrs. Carnagey, and perhaps others, did not hear such a scream; all were as near or nearer to the Scott home than any of the witnesses who say they heard the scream; no intimation is made that these witnesses were testifying falsely about the matter.   Then why should the defendant be said to be testifying falsely when he said he did not hear the scream? There is, of course, no reason.   (*Weir v. Railways Co.*, 108 Kan. 610, 612, 196 Pac. 442; *K. C. Ft. S. & G. Rld. Co. v. Lane*, 33 Kan. 702, 7 Pac. 587.)   If the design or effect of giving this instruction was to assist the state in having the jury adopt a fallacious reasoning on this question, it was erroneous and prejudicial to defendant. Considering all the testimony relating to the matter, the question

whether there was a scream of a woman between the shots is of little or no consequence as bearing upon the guilt or innocence of the defendant.

In instructions 15 and 16 the court, after properly defining circumstantial evidence, added this paragraph:

"And I further instruct you that, when the evidence in a case consists of a chain of well authenticated and proven circumstances, it is often more convincing and satisfactory and gives a stronger ground of the assurance of the defendant's guilt than the direct testimony of witnesses, unconfirmed by circumstances."

This paragraph is objected to, first, because it places circumstantial evidence upon a higher plane than positive evidence, and second, because it deals with circumstantial evidence only as it applies to guilt, when in fact it may be as potent to prove innocence as it is to prove guilt. Both points are well taken. The paragraph should not have been included in the instructions. An instruction in the same language was held nonprejudicial in *The State v. Evans*, 115 Kan. 538, 540, 224 Pac. 492, where is was construed as meaning that "well authenticated and proven circumstances" might be more convincing than the testimony of witness who might not be telling the truth. But when jurors must be informed of the circumstances by the testimony of witnesses, there may be false testimony concerning circumstantial evidence as well as positive evidence. (See, 1 Wigmore on Evidence, 2d ed., § 26, and authorities there cited; also 16 C. J. 763.)

During the trial the state had shown that about eight or nine months before her death, Ella Scott had taken out a life insurance policy for $3,000, payable to her estate in the event of her death. The defendant requested an instruction that in the event of his conviction he could not inherit that life insurance, but the same would be inherited by her parents. That is the statute. (R. S. 22-133.) This was refused. It should have been given; it had a direct bearing upon the interest in the result of the trial of the witness Sarah Holt, and an indirect bearing upon such interest of the witnesses Mrs. Stephens, Mrs. Rogers, Leona Rogers, and Earl Cox.

Other questions are argued. Some of them have no merit, others have; but we think it unnecessary to discuss them. Perhaps they will not arise again.

The judgment will be reversed, with directions to grant a new trial.

HOPKINS, J. (dissenting): I cannot concur in the conclusion reached by the majority of the court. In my opinion, the record in this case fails to sustain the majority opinion in the essential details necessary to such a conclusion. A reversal is predicated upon the ground that the trial court erred in rejecting certain testimony tending to show that some "mysterious stranger" might have committed the murder. If this offered testimony was properly excluded many minor errors alleged by the defendant and discussed in the majority opinion were not of sufficient magnitude to require reversal. I will, therefore, give attention, chiefly, to the defendant's rejected offer.

A brief statement of the conditions surrounding the tragedy is proper. Ella Scott, wife of the defendant, was mortally wounded about eleven o'clock at night in her home at La Cygne. She was shot twice with a .32 calibre Smith & Wesson revolver. One shot took effect in her right breast and the other in her left breast near the heart. Her husband was charged with the crime. To show a motive the state introduced evidence tending to show trouble between the defendant and his wife on account of alleged relations between the defendant and one Arlene Scott. Arlene Scott was a niece of the deceased but no blood relation of the defendant. She had lived with the defendant and his wife for four years and at the time of the murder was nineteen years old. The defendant was thirty-two. A short time before the tragedy Arlene Scott had gone to Pittsburg, where she was attending teachers' college. On the night of the murder the defendant and his wife returned home from a show in their automobile. The wife got out and went in the house, leaving the defendant at the garage. She was shot a few minutes later. The defendant claimed that he was at the garage fixing his automobile when the shots were fired. The jury concluded otherwise, and in my opinion were amply justified from the facts and circumstances disclosed by the record. The admitted actions of the defendant himself at the time of the tragedy; the things he did and the things that he failed to do must have had weight with the jury in its conclusion that he was the guilty party. First, he heard the shots, but no scream, although six witnesses testified positively that they heard the scream of a woman either between the firing of the two shots or immediately after the last one, or that the scream was cut off by the second shot. These witnesses lived north, east and west of the Scott home. Two of them lived north and beyond the

garage where the defendant claims to have been at the time the shots were fired. Second (and if the defendant is not guilty these things are so remarkable they pass understanding), the defendant, on discovering that his wife had been mortally wounded, left her lying on the floor alone in the house while he went away. He met a friend in the street, told him to go to his wife, while the defendant himself went a block and a half away from home to get a doctor. He could have stepped to his own telephone, called the doctor, and remained to minister to the needs of his dying wife, or he could have sent his friend for the doctor and himself remained. Third, he did nothing nor asked anybody to take action to ascertain and capture the guilty party. Other people did that. Fourth, after returning to his home from the doctor's, when other people had gathered and were endeavoring to save his dying wife, the defendant sat down in a chair near the door with his back turned to her and the people administering to her.

The defense makes much of the fact that the gun with which the shots were fired was not found on the premises. It was the most reasonable thing in the world that it was not found. Doubtless the jury concluded that when the defendant ran away through the darkness a block and a half away from the scene of the tragedy, under the pretense of calling the doctor, he could, and likely did, secrete or throw away the revolver. Anywhere on his journey of a block and a half in the darkness, he could have thrown the revolver 150 or 200 feet either north or south and so far away from his own premises that as a matter of course it would not be found there.

It should not be overlooked that an able trial court had considered the matters presented in this case three times previous to the trial under consideration. First, in a preliminary hearing; second, in a trial resulting in a hung jury; third, in a second preliminary hearing when the defendant was charged jointly with Arlene Scott. With this situation the defendant offered testimony that within five minutes after the tragedy a strange man was seen across the street from the Scott home going toward the main street of La Cygne; that about the same time, or a little later, a man was seen running along the right of way of the Frisco railroad several blocks distant from the scene of the tragedy; that a man was seen by two trainmen on a Frisco freight train that came through La Cygne about two or three o'clock in the morning; that the train had been examined at Paola and nobody was riding it except the train crew; that from a

photograph this man that was seen on the freight train was a man who had been in the penitentiary and had been convicted of petty larceny, and that his home was in Pleasanton, and that he had a bad reputation as a peaceable, law-abiding citizen. The defendant offered this testimony on the theory that one accused of crime may introduce evidence to show that it was committed by another and that, therefore, he did not commit it. The defendant suggests that an intruder committed the murder and then, on his own suggestion, pyramids a theory in support of which he strenuously argues that the intruder, having committed the deed, retreated from the kitchen door through the garden to the alley in a northeasterly direction, and that when a sufficient number of excited people had gathered in the vicinity he came back, mingled with the crowd, then walked on across the street, stopped and talked with Laura Rowley, and then made his get-away towards the railway stock yards. The record fails to support any such theory. There was no evidence that the Scott home had been burglarized; no evidence of any confusion of any kind, no bureau drawers pulled out and the contents disturbed, no evidence of any places ransacked, no evidence that anyone had attempted to forcibly enter the home. Instead of there being a "mysterious stranger," what happened is quiet apparent. L. P. Bishop, a banker of La Cygne, who lives a block west and across the street south from the Scott home, was in bed on his sleeping porch at the nearest corner of his house to Scott's. He heard the shots and outcries, got up, went in the house, put on some clothing and went to the Scott home, arriving immediately after the defendant had returned there from the doctor's. Bishop made some investigation about the house and premises and decided that he needed a flashlight. He went back across the street toward his home and was accosted by Laura Rowley, with whom he had some conversation concerning the tragedy. He saw Laura Rowley's father and mother there. He went on to his house, got his flashlight and returned to the Scott home. This was all done within a very few minutes. Laura Rowley testified that she talked with some stranger who came by her house, but that she did not see nor talk with Mr. Bishop that night. It is very apparent that if the alleged stranger had come by her house and she had held any such conversation with him as the defendant offered to prove, there would have been no occasion for her making inquiry of Mr. Bishop. If she had previously talked

with Mr. Bishop and the alleged stranger came later there would
have been no occasion for her to have questioned the stranger.
Under the circumstances it is perfectly apparent that in the excite-
ment and confusion Miss Rowley inquired of but one man con-
cerning the tragedy, and that man was Mr. Bishop. All of the
physical facts and circumstances that surround the scene of the
tragedy go to refute the theory that there was a burglar in the house.
Mrs. Scott was found lying on her back with her head toward the
south. This indicates that she was facing toward the north when
she was shot. There was an empty pistol shell by the door which
leads from the north into the dining room where she was lying.
Without a doubt the person who fired the bullets in those shells was
either in that doorway or just inside it. This is the doorway through
which Mrs. Scott entered the dining room from the kitchen. It was
the natural path for anyone to take on entering the house from the
garage in the rear. The person who shot Mrs. Scott was between
her and the open door, and could not have been surprised at the
time the light was turned on. The record contains no evidence that
on any reasonable hypothesis this murder was committed by a
burglar.

Another circumstance should not be overlooked. The Scott house
was under surveillance almost immediately on all sides from the
time the shots were fired. Mr. Leivy stepped almost immediately
to his front door, which is just opposite the east side of the Scott
home, and did not see anybody running away from that house. Mr.
Molesworth, who lived on the south across the street, stepped to the
door and looked out and did not see anybody come from the front
door· of the Scott home. Mrs. Plume Murray, who lived north,
looked out and did not see anyone running away from the rear, al-
though she did see Scott come out of the west dining room door. Mrs.
Hesser, who lived a block north and across the street, was sitting at
her window from which the Scott home was in view. She had seen
the Scotts come home. She heard the shots, and could distinguish
objects toward the Scott home, but saw no one running away from
the rear. The defendant himself was immediately in the rear of the
house and does not claim to have seen anybody, nor did he hear the
slam of any screen door, which must have almost inevitably occurred
had anyone stepped hurriedly out after having committed a deed
such as described in this case. The defendant offered to prove that

the alleged individual who walked west along the street and who was seen a few minutes afterward, or about the same time, some five or six blocks away, going in the direction of the stockyards, answered the description of one Fred Slavens; that the conductor and brakeman on the train who saw this person believed from a picture of Fred Slavens that he was the one on board their train; that Fred Slavens had a bad reputation of being a bandit and motor-car thief, and that he had served time; that his home was in Pleasanton. The defendant argues that this "mysterious stranger" waited at the stockyards three or four hours and boarded the train that came through (a through freight not scheduled to stop, and did not stop, but was running five or six miles per hour when it passed the stockyards). There is nothing in the record of any inquiry made at the home of Fred Slavens to ascertain whether he was in the country at that time or had been there within any reasonable time, nor that anyone ever saw Fred Slavens in La Cygne at or about the time of the murder or at any other time. It was within the province of the trial court to take cognizance of all these matters when considering whether to admit the defendant's offered testimony. It concluded, and in my judgment properly so, that it was incompetent to prove or disprove any issue in the case; that it was too remote, too disconnected to prove or disprove any essential fact connected with the murder.

If Fred Slavens had been arrested and tried for this crime, the state could not have proven that he was a bandit, an automobile thief and a man of bad reputation unless he had first put those matters in issue. On what theory, then, can it be said that the trial court erred in rejecting the offered testimony to show that Fred Slavens was of bad reputation, a bandit or motor-car thief? The true rule excludes all evidence of collateral facts which are incapable of affording any reasonable presumption or inference as to the principal facts or matter in dispute, the tendency of which is to divert the mind from the points in issue, and to excite prejudice and mislead or confuse the jury. The extraneous matters concerning Fred Slavens were clearly not competent. The court was therefore left with the offer to prove that a person bearing the description of Fred Slavens had walked along the street and in answer to an inquiry had said that someone over there had been shot. To have admitted such testimony could have done no more than raise a suspicion or confuse the minds of the jury. If this testimony was competent

similar testimony concerning several hundred others in La Cygne that night would have been competent. In all reason a criminal trial should not be unduly prolonged by the introduction of remote matters. The minds of the jury should not be distracted from the real question at issue. The ruling of the trial court is supported by the great weight of authority. A well-considered case in point is *Irvin v. State*, 11 Okla. Crim. Rep. 301, 146 Pac. 453. In the opinion it was said:

"While it is competent for the defendant to show, by any legal evidence, that some other person committed the crime with which he is charged, and that he is innocent of any participation in it, such evidence must tend to connect such other person with the commission of the crime charged. An examination of the authorities will show that it is generally held that evidence which could have no further effect than to cast a bare suspicion upon another is incompetent and inadmissible. In the case of *Greenfield v. People*, 5 N. Y. 76, 39 Am. Rep. 636, it is said: 'While evidence tending to show that another party might have committed the crime would be admissible, before such testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances as tend clearly to point out some one besides the prisoner as the guilty party. Remote acts, disconnected, and outside of the crime itself, cannot be separately proved for such a purpose.' In *State v. Moon*, 20 Idaho 202, 117 Pac. 757 Ann. Cas. 1913*a*, 724, it is said: 'We do not understand that an orderly and unbiased judicial inquiry as to the guilt or innocence of a defendant on trial contemplates that such defendant should be permitted by way of defense to indulge in conjectural inferences that some other person might have committed the offense for which he is on trial, or by fanciful analogy to say to the jury that some one other than he is more probably guilty.'" (p. 331.)

In 6 Encyc. of Ev. 750 the rule is stated that:

"The mere proximity of a third person to the scene of a homicide or assault is irrelevant."

In *The State v. Beck*, 73 Iowa 616, the court held that offered evidence which went only to show that a certain person was in the neighborhood of the offense at the time it was committed, was not sufficient to warrant its being submitted to the jury. It was said:

"Defendant offered to prove by another witness that Wolf was in the neighborhood at about the time that the crime was committed, but the evidence was excluded. . . . The belief afterwards expressed by him that Wolf was one of the party was not evidence of that fact, so that if the excluded evidence had been admitted the whole question would have rested on the fact that Wolf was in the neighborhood at the time, but that fact alone has no tendency to prove that he was concerned in the commission of the offense; that the evidence was rightly excluded there can be no question." (p. 618.)

The State v. Scott.

In *Carlton v. The People*, 150 Ill. 181, the court held, in speaking of testimony similar to that offered in this case:

"The proof must connect such third person with the fact; that is, with the perpetration of some deed entering into the crime itself; there must be proof of such a train of facts and circumstances as tend clearly to point to him rather than to the prisoner as the guilty party." (p. 188.)

In *Walker v. The State*, 35 South. 1011, the court held:

"Where there was no evidence tending to connect a third person with the crime, evidence that such person had a motive to commit the crime, and that he was in the town where deceased was killed on the night the killing occurred, but that witness had not seen him since, was inadmissible."

In 30 C. J. 166, it is said:

"Remote acts, disconnected and outside of the crime itself, cannot be separately proved for such a purpose. An orderly and unbiased judicial inquiry as to the guilt or innocence of a defendant on trial does not contemplate that such defendant should be permitted by way of defense to indulge in conjectural inferences that some other person might have committed the offense for which he is on trial, or by fanciful analogy to say to the jury that some one other than he is more probably guilty." (See, also, *Phillips v. State*, 203 Pac. 902; Oklahoma cases cited in *Irvin v. State*, supra; *State v. Taylor*, 136 Mo. 66; *The State v. Lane*, 166 N. C. 333; *Golin v. State*, 37 Tex. Cr. Rep. 90; *Davidson v. The State*, 135 Ind. 254.)

The state introduced evidence of various acts occurring between the defendant and Arlene Scott for the purpose of showing the relations existing between them and as furnishing a foundation for motive. Gus Clark and his wife testified to an occurrence about eleven months before the murder which took place at the home of one of the relatives. They testified that the defendant and Arlene Scott were scuffling; that he pinched her knees, and took other familiarities with her person. While the incident may not have been of much importance, it was competent, together with other incidents, to show the relations of the parties and, in my opinion, should not be precluded on another trial.

Defendant complains of instruction No. 20, which dealt with positive testimony as compared to negative testimony. The instruction under the circumstances was not improper. Six witnesses had testified directly that they heard a woman's scream at about the time or immediately after the firing of the shots. The instruction not only was proper as an abstract proposition, but was proper under the evidence shown in the record.

The failure of the court to define the word "motive" was not er-

ror.   The context in which the word was used made its meaning sufficiently clear.   The general charge to the jury sufficiently covered that proposition as well as others to which objection was made

Other objections need not be noted.

No error has been pointed out which would warrant a reversal of the judgment.

JOHNSTON, C. J., joins in this dissent.