No. 61,445

STATE OF KANSAS, *Appellee*, v. RODNEY E. JACKSON, *Appellant*.

(772 P.2d 747)

Opinion filed April 14, 1989.

*Steven R. Zinn*, supervising attorney, of Kansas Appellate Practice Clinic, of Lawrence, argued the cause, and *Jeff Bergschneider*, legal intern, and *Benjamin C. Wood*, chief appellate defender, of Topeka, were with him on the brief for appellant.

*Mona Furst*, assistant district attorney, argued the cause, and *Robert T. Stephan*, attorney general, and *Clark V. Owens*, district attorney, were with her on the brief for appellee.

The opinion of the court was delivered by:

HOLMES, J.: Rodney E. Jackson appeals from his conviction by a jury of one count of aggravated battery, K.S.A. 21-3414. The Court of Appeals affirmed the conviction in an unpublished opinion filed October 7, 1988. We granted the appellant's petition for review. We reverse.

Robert Thurman, the victim in this case, testified that in October 1983 he attended a party at a sorority house. Shortly after midnight, Thurman went out to his car in the parking lot. He was approached by a stranger who asked where he could obtain cocaine or drugs. Thurman told the man he was not into that sort of thing. The man reacted with anger, pushed him, and took a swing at him. Thurman went back to the house and called

the police. When he went back outside, the windshield of his car had been broken, and a young lady told him that the man he had been arguing with earlier had broken the windshield.

Thurman did not see the man again until January 2, 1984. Late on January 1, 1984, Thurman arrived at the Chicago P.M. Club in Wichita, which had formerly been the Club International. Sometime after midnight, he recognized the man who had approached him at the sorority party three months earlier. At this point Thurman still did not know the man's name, but he had learned from friends that he was known by the name of "Slim." Thurman walked over to Slim and asked if he recognized Thurman, and Slim replied that he did.

Thurman returned to his group of friends and began telling them about the windshield incident, pointing out Slim as the one who was responsible. Thurman testified that as he turned around to continue the conversation, Slim lunged at him, stabbed him in the side with a knife, and ran. The victim sustained severe injuries.

After Thurman was released from the hospital in late February, a detective showed him some mug shots. Thurman immediately picked out a photograph of the appellant, Rodney E. Jackson, also known as Slim. Thurman also identified Jackson at trial.

The appellant was originally tried and convicted in a bench trial on July 30, 1984. On March 31, 1986, he was granted a new trial based upon newly discovered evidence. At the second trial, which took place before a jury, Rodney Jackson relied upon an alibi defense, and sought to show that someone else committed the offense. The defense, at a hearing outside the presence of the jury, proffered the testimony of Gus Hankins and Darlene Finley. The proffered testimony was to the effect that a third party, Tommie Mays, had made statements indicating that he was the individual who committed the offense with which Rodney Jackson was charged.

After hearing the proffered testimony of Hankins, the trial judge ruled it was irrelevant and lacked reliability, and excluded the proposed testimony. The judge then heard the testimony of Darlene Finley and ruled it was inadmissible without giving any explanation of his ruling.

At the close of the evidence, the jury returned a verdict of guilty. The defense filed a motion for new trial, which included

the issues raised in this appeal. The trial court denied the motion. Jackson timely appealed.

The Court of Appeals found that the statements made by Mays to Darlene Finley were clearly against his penal interest, but that there was no evidence presented at trial to show that the statements were made within the two-year period of the statute of limitations. The court went on to summarily hold, apparently on the basis of the statute of limitations, that the trial court did not err in excluding the testimony. The court never mentioned the proffered testimony of Hankins.

Appellant raises several evidentiary issues on appeal, only one of which we need to address as it is dispositive of this appeal.

Appellant's first issue relates to the exclusion of the testimony proffered by the defense implicating Tommie Mays as the perpetrator of the offense. The trial court ruled inadmissible the proffered testimony of Gus Hankins and Darlene Finley pertaining to out-of-court statements made by Tommie Mays. Appellant argues, *inter alia*, that the incriminating out-of-court statements by Tommie Mays were admissible under the hearsay exception for declarations against interest and that it was reversible error to exclude the evidence.

K.S.A. 1988 Supp. 60-460 provides, in part:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(j) *Declarations against interest*. Subject to the limitations of exception (f) [prior confessions of the accused], a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule or social disapproval in the community that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true."

The State contends that the appellant failed to establish the necessary foundation for the admission of the Hankins and Finley testimony as exceptions to the hearsay rule. It argues that not only did the appellant fail to establish the trustworthiness of the statements, but also he failed to show that Mays was unavailable to testify as a witness. The admissiblity of testimony under 60-460(j) was discussed in *Thompson v. Norman*, 198 Kan. 436, 424 P.2d 593 (1967). In *Thompson*, the court stated:

"This [subsection (j)] broadens our former case law in the realm of declarations against interest by those not parties to the action nor in privity with a party to the action, as exceptions to the hearsay rule. Formerly there was a requirement of unavailability of the declarant as a prerequisite for reception of this character of testimony, and declarations were limited to those against the pecuniary or proprietary interest of the declarant (*Hurley v. Painter*, 182 Kan. 731, 324 P.2d 142). Now, the statute dispenses with the requirement of unavailability and expands the interests to include penal or social.

"The statute does, however, require, as a preliminary measure of trustworthiness, that the trial judge, prior to admission of such a declaration, make a finding that the character of the declaration was of such nature a reasonable man would not make it unless he believed it to be true. Probability of veracity is the safeguard sought; the reasonable man test is the criterion to be used. The judge may in a particular case be faced with a difficult decision where caution should be exercised; in making it he necessarily must be vested with a wide discretion. And it should be kept in mind he is concerned with admissibility, not weight, of evidence." 198 Kan. at 442-43.

The test of admissibility stated in *Thompson* was specifically recognized and approved in *State v. Prince*, 227 Kan. 137, 147, 605 P.2d 563 (1980).

The State relies upon *Prince* and *State v. Quick*, 226 Kan. 308, 597 P.2d 1108 (1979), in asserting that the declarant (in this case Mays) must be present at the trial or it must be shown the declarant is unavailable as defined in K.S.A. 60-459(g). Reliance on *Prince* is totally misplaced. In *Prince*, the trial court did exclude 60-460(j) evidence for the reason that the declarant asserted his Fifth Amendment right not to testify and was unavailable for cross-examination. However, this court affirmed the defendant's conviction based upon a lack of foundation for the proffered testimony and specifically found that the trial court had excluded the testimony for the wrong reason. 227 Kan. at 147.

In *Quick*, the trial court excluded certain testimony which fell within the declarations against interest exception of 60-460(j). Although this court, in reversing the defendant's conviction, did discuss the unavailability requirement, the court's decision was actually based upon a finding that "[t]he indicia of reliability of the declaration against penal interest was sufficient to justify the admission of the declaration as an exception to the hearsay rule." 226 Kan. at 318. The statements in *Quick* that the declarant must be present at trial or, if not, the proponent must show that a diligent effort was made to locate the declarant and that he is unavailable, are specifically disapproved.

The State also relies heavily on two rules established by our case law, neither of which is applicable here.

(1) When the State relies on direct rather than circumstantial evidence for conviction, evidence offered by the defendant to indicate a *possible motive* of someone other than the defendant to commit the crime is irrelevant absent other evidence to connect such third party with the crime. *State v. Potts*, 205 Kan. 42, Syl. ¶ 1, 468 P.2d 74 (1970); *State v. Neff*, 169 Kan. 116, Syl. ¶ 7, 218 P.2d 248, *cert. denied* 340 U.S. 866 (1950).

(2) Where the State's case is built on direct evidence, *circumstantial* evidence that someone other than the defendant committed the crime is irrelevant in the absence of other evidence to connect such third person with the crime. *State v. Brown*, 230 Kan. 499, 499-500, 638 P.2d 912 (1982); *State v. Calvert*, 211 Kan. 174, 179, 505 P.2d 1110 (1973); *State v. Henderson*, 205 Kan. 231, 239-40, 468 P.2d 136 (1970); *cf. State v. Scott*, 117 Kan. 303, 313-15, 235 Pac. 380 (1924); *State v. Smith*, 35 Kan. 618, 621, 11 Pac. 908 (1886).

The trial court apparently relied upon *State v. Brown* and *State v. Neff* in holding that the proffered evidence was irrelevant.

The evidence presented by the State against the appellant consisted of direct evidence in the form of testimony by two eyewitnesses, the victim and Inman Standifer, who identified the appellant as the perpetrator. However, the evidence proffered by appellant was not circumstantial evidence; nor was it evidence indicating that someone other than the appellant had a possible motive to commit the stabbing. The proffered evidence was direct evidence in the form of out-of-court admissions by a third party, Tommie Mays, that he committed the crime for which the defendant was charged. The State's reliance on the foregoing cases is therefore misplaced.

We now turn to the proffered testimony to determine whether it met the necessary test of relevance, reliability, and trustworthiness to be admissible under the declarations against interest exception to the hearsay rule.

After having established the identity of Gus Hankins and his acquaintance and association with Tommie Mays, the defense presented the following testimony:

"Q. Mr. Hankins, would you please relate the conversation you had with Mr. Mays there in the penitentiary in 1985 with regards to this stabbing?

"A. We was coming back from the yard, me and him and another inmate by the name of Alvin Brown. And he was telling me and Alvin Brown about the stabbing. Said it was better the other guy than him, you know.

"THE COURT: I still didn't understand what you said.

"MR. GEARY: It was the other—better the other guy than him, is what he said, Your Honor.

BY MR. GEARY:

"Q. Did he tell you the name of the person he stabbed?

"A. No, he didn't.

"Q. Did he tell you when this occurred?

"A. Just said in the club. He didn't say when.

"Q. Did he mention the name of the club?

"A. International.

"Q. Okay. Was there any further conversation at that time?

"A. Naw.

"Q. Did he indicate a date when this stabbing occurred?

"A. No, he didn't.

"Q. Okay.

"MR. GEARY: Your Honor, that would be the contents of the testimony of Mr. Hankins."

The proffered testimony of Hankins indicated that Mays made his statements to two fellow inmates while walking from the prison yard at the Kansas State Penitentiary. The statements did not indicate who the victim of the stabbing was or when it allegedly occurred. Mays had merely indicated he had stabbed someone at the International Club and that "it was better the other guy than him." Such vague and indefinite admissions fall short of the necessary showing of credibility and trustworthiness required to establish a proper foundation for admissibility of Hankins' testimony. We find no error in the trial court's determination that the Hankins testimony was not only irrelevant but also lacked reliability.

The proffered testimony of Darlene Finley is another matter. After qualifying Finley by showing her acquaintance and contacts with Tommie Mays, the defense presented the following testimony from Finley:

"Q. At anytime, did you have the occasion to discuss a stabbing with Mr. Mays?

"A. Yes.

"Q. Tell the Court what happened.

"A. It was in their home, and we had came over earlier that evening. We were going to go out. We had started playing cards or whatever, I don't know, but we were sitting on their floor. They didn't have very much furniture, and

Rena Mays went on to say how scared she was when Tommie done something. And he looked at her like to shut up. Okay. Rena had gotten kind of tipsy, so she would talk a lot when she got that way. He did—he looked at her to shut her up, and then he just changed his mind and he went ahead and told the story.

"Q. What did he tell you?

"A. He, first of all, asked us did we hear about the guy that got stabbed at the International at New Year's. And my husband, at the time worked at Wesley Hospital, he seen him when he was brought in, and he said yeah. And then he said—he went on to describe—to tell why he done it. It was over a bad dope deal. The guy had sold him some bad coke, which was Robert Thurman. And he went—he said that he went back, broke out Robert's windows on his car, and that—that was during the summer. Okay. The cocaine that he bought and went and broke Robert's windows, that was during the summer, I believe. This is what Tommie said, that that happened during the summer. And he did not run into Robert Thurman again until that night at the club. Him and Rena went out and Tommie and—I mean that Robert Thurman seen him, and I guess recognized him as the guy that broke out his window, and went over to their table, and Tommie told us how he bent over and told Tommie that they were going to have a meeting outside. Either said—it's been so long, I don't remember if he said they were going to have a meeting outside, or they were going to have a get-together or gathering, or something, outside. But Tommie took that to mean—he said that Robert Thurman walked away from him, went back over to—up against a wall where there was some guys and like pointed Tommie out. Okay. And like they were talking. He said he knew they were setting him up for something outside. And he described—the way Tommie talked—you would have to know Tommie to know how he talked. He would kind of go off into a military-type thing. He had lots of weapons laying around and stuff. And he said that that was where Robert Thurman made his fatal mistake was putting that fear in him, when he come over and told him that. He said because he did not see Robert, Robert saw him and came over, and said that—he said that's when he told Rena to hand him the knife. And she handed it to him from up under the table. And he had a long black coat. He had it, put it over. He said he waited until Robert—some kind of—he had his back turned, he walked over, he said he told Rena to get up and come over and not say anything. He said Robert did not see him coming, he did not see him at all. He said—he really bragged about how smoothly he stabbed him. He said that he could have—he got up and he motioned how he came from around Robert Thurman with the knife, like this (indicating), to the front of him, you know. Came from behind him and around, and how he turned it and whatever. He said that he knew exactly where he was stabbing him, the whole bit. And that he could have killed him if he wanted to. I guess this is how well he supposed to know the body from being military trained. He was a red beret or something. He was really far gone military like. And whenever he would go out, he would dress up in this outfit, this red beret thing. And he said—and then he said that when he done it, he said it was so smoothly done when he stabbed Robert, he said

that him and Rena kept walking. He told her to come on, not look back, and that they just walked right on out of the place. He said no one seen him. And so I don't know if Robert gasped or staggered on or what, but he said no one seen anything, and they left, you know, the Club International. And at that point, Rena was talking about how nervous and scared she was, but that no one saw them. And Tommie, he bragged about how smoothly he done it, you know. He stood up and showed, you know, on my husband how and where he stabbed him and why, you know. And, well, he said why because Robert had come over and he knew—he said that was Robert's mistake. He said he would have been better off—because he did not see Robert in that club, he said if Robert had of waited for him to leave and then got him outside it would have been different. He said but that was Robert's mistake when he walked over to him and told him what he was going to do out—you know, when they left the club.

"Q. Miss Finley, do you know Rodney Jackson here?
"A. I have never seen him before this morning.
"Q. Okay. You never met him before?
"A. Never met him. Never seen him or nothing, no."

Following this proffered testimony, the State again objected to its admission, asserting, "[W]e are still going to have to determine the availability of Mr. Tommie Mays." The court then ruled the testimony was inadmissible.

We think the court erred in its determination that the testimony of Darlene Finley was inadmissible. The defense went to great lengths to establish the social relationship between Darlene Finley and her husband and Tommie Mays and Rena Mays. The two couples visited together in each other's homes and evidently were quite friendly during the spring and summer of 1984. The testimony of Mrs. Finley related numerous details of the Thurman stabbing, established who the victim was, and established when and where the stabbing took place. The evidence would appear to meet the threshold test of *Thompson v. Norman*, 198 Kan. 436, and the trial court has failed to articulate any basis for its ruling that the testimony was inadmissible. The Court of Appeals found that the Finley testimony constituted a clear statement against Mays' interest, and we agree. However, there is no support in the record for the Court of Appeals' *sua sponte* finding that there was no evidence that the statements attributed to Mays were made within the two-year statute of limitations period. It is clear to us from a review of the record that the statements allegedly made by Mays to Finley were within two years of the Thurman stabbing.

Based upon the record before us, we hold that the trial court

erred in refusing to admit the proffered testimony of Darlene Finley as an exception to the hearsay rule under K.S.A. 1988 Supp. 60-460(j). In view of this determination, it is not necessary for us to reach the other issues asserted on appeal.

The judgments of the Court of Appeals and the district court are reversed and the case is remanded with directions to grant the defendant a new trial.