No. 71,122

STATE OF KANSAS, *Appellee*, v. DAVID C. BROWN, a/k/a
Christopher D. Brown, *Appellant*.
(904 P.2d 985)

Opinion filed October 27, 1995.

*Thomas Jacquinot*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Mike E. Ward*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by David C. Brown from his convictions for first-degree murder and attempted aggravated robbery. He was sentenced to life on the first-degree murder charge and 3 to 10 years on the attempted aggravated robbery charge, with the sentences to run consecutively.

The defendant raises five issues. He claims error in his certification to be tried as an adult, in the admission of evidence, in not giving an instruction on voluntary intoxication, in denying a change of venue, and in the admission of his confession into evidence.

This case arises from the shooting death of Richard Johnston, a clerk at the Kwik Shop in Augusta, Kansas. As a result of cancer surgery to his throat, Richard Johnston had limited ability to verbally communicate. At 2:38 a.m., a 911 call was made by an unidentified person. The dispatcher was unable to discern what the person was saying, but later review of the taped call revealed that the person said, "I've been shot, been shot." Augusta does not have an enhanced 911 system, so the dispatcher was unable to trace the location from which the call was made. Around 3:15 a.m., a customer discovered the clerk at the store and reported his death. The Kwik Shop telephone was off the hook. The cause of Johnston's

death was two bullet wounds, one above the right breast and one below the middle chest area. Two additional bullets were recovered from the scene.

Around noon the same day, the defendant was taken into custody by El Dorado law enforcement officers who were investigating the shoplifting of an air pistol from the El Dorado Wal-Mart. Realizing the defendant was from Augusta, the officers *Mirandized* the defendant and questioned him about his activities the night before and about Johnston's homicide. The defendant denied any knowledge about the murder but admitted he was at the Kwik Shop the previous night. Augusta authorities were notified, and they came to El Dorado.

At approximately 4:30 p.m., Augusta Officer McNown and KBI Agent Green began interviewing the defendant. The defendant was again *Mirandized* and the questioning continued for several hours. At that time, the defendant was living in Augusta with Frankie Grissom; Frankie's husband; and Frankie's son, Gary Hastings. The Grissom home was in close proximity to the Kwik Shop, and the defendant often frequented the Kwik Shop. The defendant felt that he was in danger of being asked to leave the Grissom home. Frankie had given away the defendant's dog, and the defendant felt he was not getting along with Frankie. Initially, the defendant stated that friends had come over to the Grissom house on the evening in question. Later, the defendant admitted that he had gone to the Kwik Shop on the night in question to buy cigarettes.

Upon further questioning, the KBI agent accused the defendant of committing the murder. At this time, the defendant stated, "I did it," and he hit the wall with his fist. The defendant related the following information about the crime. He went to the Kwik Shop and told the clerk, "Give me all your money." The clerk made a motion, and the defendant shot the clerk three or four times. The defendant said he used a gun that he had had for awhile, which Gary Hastings did not know about. When the officer asked the defendant if he shot three or four times, he said four. At that time, the questioning officers did not know how many shots had been fired, nor had this information been released to the press. The defendant said he grabbed a handful of cigarettes and ran home

and that he threw the gun into an alley. The defendant indicated that he robbed the store to get money to buy a car stereo for Frankie Grissom's birthday. The defendant wrote a letter of apology to the Johnston family, saying he felt bad about what he had done. The defendant also drew a picture of the alley where he claimed to have thrown the gun. However, the defendant later told the officers that he put the gun on the headboard of his bed at the Grissom home.

The defendant was taken to the hospital to check his hand, and upon return to the jail the officers asked if they could tape record an interview with the defendant. The defendant agreed. The defendant then stated that he had lied about shooting the clerk. He said that he had only confessed so he could have a cigarette. At the trial, the defendant testified that he made up the confession based on news reports he had heard about the murder and based on information the officers had related during the questioning.

The officers obtained a search warrant for the Grissom house. They did not find the gun. Frankie Grissom later turned in two guns which she found in the trunk of her car. One of the guns, which belonged to Gary Hastings, may have been the murder weapon, but a positive identification was impossible because the gun was of a quality that left different characteristics on each bullet fired. The parties seem to agree that Gary's gun was the murder weapon.

In addition to his confession, the defendant discussed the incident with other people. Shawn Smith, who was in a jail cell next to the defendant, testified that the defendant told him about the night in question. The defendant told Smith he had been using alcohol and marijuana that night. The defendant was with his "brother" (Gary Hastings) and another friend. They decided to rob a store, and Gary and the defendant fought over the gun. The gun went off and shot Johnston. The defendant then took the gun and shot Johnston three times so no one would know who shot the gun. Ralph Ballinger, who was also in a jail cell near the defendant, testified that the defendant told him he went to the Kwik Shop to rob it. He thought the clerk was reaching for a gun, so he fired one shot into the counter, two shots into the back wall, and one shot

at the clerk. The defendant told Ballinger that he then left the store and later returned with two other people. In addition to this story, the defendant also told Ballinger, at a different time, that his "brother" (Gary Hastings) had shot the clerk, not the defendant. Mike Nagy testified that he was in a jail cell with the defendant and that the defendant told him varying stories. The defendant told Nagy that his "brother" Gary Hastings, not the defendant, had shot Johnston. The defendant told Nagy that he (the defendant) had confessed so Gary would not go to prison.

Gary Hastings was issued a subpoena to testify at trial, but authorities were unable to locate him or his mother. Gary did testify at a preliminary hearing, and this testimony was admitted into evidence at trial. Gary stated that he, the defendant, and Travis Church went to the Kwik Shop around 9:00 p.m. to play video games. The boys returned to the Grissom home without incident. Later, the defendant left the Grissom house with Gary's gun, saying he was going to rob the store. The defendant returned 25 minutes later and said, "I did it, I did it." The defendant began lifting weights and then said, "I shot him." He put the gun on the bed. When Gary did not believe the defendant, Gary, Travis, and the defendant returned to the store. Gary stayed near the door and did not see the clerk. The defendant took some cigarettes and a hat, and Gary took some cigarettes. All three returned to Gary's house.

Travis Church was present at the defendant's trial and testified as to his version of the evening. Travis stated that the defendant or Gary mentioned something about a robbery. Gary shaved some bullets with a knife and put green paint all over the defendant's face and his arms and hands. The defendant was also wearing surgical gloves and a face mask. The defendant said he was going to rob the Kwik Shop and left the house. The defendant was going to use his own gun, but Gary told him to take his (Gary's) gun because it held more bullets. The defendant returned 7 or 8 minutes later and began doing pushups. The defendant then cleaned his face and resumed doing pushups. The defendant told Travis and Gary that the clerk had reached for the phone or something and the defendant shot him. All three then returned to the store. Travis saw some blood on the counter and saw the clerk lying

on the floor. The defendant grabbed a hat and some cigarettes, and Gary grabbed some cigarettes. The three then ran back to Gary's house. Contrary to Travis' testimony at trial, two people testified that Travis told them Gary Hastings shot Johnston, not the defendant.

At trial, the defendant testified that he did not shoot Johnston but that Gary Hastings did. He testified that he went to the Kwik Shop around 9:00 p.m., alone, to play video games and buy cigarettes. He then went back home and had a fight with Frankie Grissom. The defendant and Gary went to pick up Travis, and the defendant smoked some marijuana with Travis' mother. After returning to Gary's house, the defendant, Gary, and Travis smoked some marijuana and drank some beer. Gary put some green paint on his (Gary's) face. Travis cut some holes in a stocking mask, which Gary put on. Gary cut the tip off of some bullets. Gary then left for 8 to 10 minutes while the defendant stayed at the house. When Gary returned, he was breathing hard and crying. Gary put the gun on the headboard of his bed, and they smoked another joint. Travis then suggested they go back and rob the store. Travis took a Miami Dolphins hat and either Travis or Gary took some cigarettes. The defendant saw Johnston lying on the floor bleeding. The three returned to Gary's house. The defendant agreed to take the rap for Gary if the police ever found out because he did not think the police would connect Gary to the crime and whenever the defendant had been in trouble in the past he had gotten out of jail in a few days.

The defendant admitted that he told the police he did it, but he testified that he only confessed because he was told he could talk to Frankie Grissom and Gary if he did so. The defendant considered them family, calling Frankie Grissom "Mom" and Gary "brother." However, the defendant testified that after talking with his grandmother, Mike Nagy, and others, he decided that it was not worth it to lie. The defendant denied that he killed Johnston.

The jury convicted the defendant of premeditated first-degree murder and attempted aggravated robbery. The defendant received consecutive sentences of life and 3 to 10 years. He appeals his convictions.

## I. ADMISSIONS BY GARY HASTINGS

The defendant first claims that the trial court erred in refusing to admit evidence of statements which Gary Hastings made to three witnesses admitting that he (Gary) shot Johnston. The factual background relating to this claim follows.

The defendant proffered, outside the presence of the jury, the testimony of three witnesses concerning statements made to them by Gary Hastings. Laura Haase testified that a couple of weeks after Johnston's murder, she asked Gary how the defendant was doing. Gary was drunk at the time. Gary told Laura that he, not the defendant, had killed Johnston. Teri Frye testified that she heard Gary tell people at a party that he had killed Johnston. Gary went into a lot of detail about the crime, with Gary and Travis both stating that Travis had bet Gary $5 that he would not do it. Gary was drinking beer and using cocaine at the party. Frye admitted that she was drinking at that party. T.J. Weston testified that on October 20 or 21, he heard Gary tell other people at a party that he had pulled the trigger. Weston inferred that Gary was talking about Johnston's murder, although Gary never specified that. Weston was drinking at the party. Weston also testified that the defendant had told him Gary and Travis were with the defendant in the store and had grabbed things after the shots were fired. Each of these witnesses had committed prior criminal offenses.

The trial court heard extensive arguments concerning the admissibility of this testimony. The trial court addressed the admissibility of the statements as declarations against penal interest under *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), and K.S.A. 60-460(j). The court ruled that the statements did not rise to the level of trustworthiness necessary to permit the testimony.

The out-of-court statements which Gary made to Laura Haase, Teri Frye, and T.J. Weston were hearsay statements offered to prove the truth of the matter asserted. Hearsay statements are inadmissible unless one of various hearsay exceptions is satisfied. K.S.A. 60-460(j) provides an exception for declarations against interest:

"Subject to the limitations of exception (f) [concerning confessions], a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule or social disapproval in the community that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true."

K.S.A. 60-460(j) includes a requirement that the defendant make a showing of trustworthiness by the out-of-court declarant.

" 'The statute does, however, require, as a preliminary measure of trustworthiness, that the trial judge, prior to admission of such a declaration, make a finding that the character of the declaration was of such nature a reasonable man would not make it unless he believed it to be true. Probability of veracity is the safeguard sought; the reasonable man test is the criterion to be used. The judge may in a particular case be faced with a difficult decision where caution should be exercised; in making it he necessarily must be vested with a wide discretion. And it should be kept in mind he is concerned with admissibility, not weight, of evidence.' [*Thompson v. Norman*, 198 Kan. 436, 442-43, 424 P.2d 593 (1967).]" *State v. Jackson*, 244 Kan. 621, 624, 772 P.2d 747 (1989).

In *State v. Jones*, 246 Kan. 214, 219, 787 P.2d 726 (1990), this court specified factors which a judge may consider in exercising discretion as to the admissibility of a declaration against interest:

"A trial judge has wide discretion in determining the admissibility of a declaration against interest and may consider such factors as the nature and character of the statement, the person to whom the statement was made, the relationship between the parties, and the probable motivation of the declarant in making the statement."

In *Chambers v. Mississippi*, 410 U.S. 284, the United States Supreme Court discussed the admissibility of statements against penal interest. Chambers sought, unsuccessfully, to admit trial testimony by several witnesses that a third party had confessed to the murder with which Chambers was charged. The Supreme Court reversed the trial court and held that such admissions were admissible. The court discussed four factors in holding that the admissions were admissible: First, the admissions were made spontaneously to a close acquaintance shortly after the murder. Second, each confession was corroborated by some other evidence in the case. Third, each confession was unquestionably self-incriminatory

and against interest. Finally, the third party who was said to have admitted committing the crime was present in the courtroom, had been under oath, and was available for cross-examination. 410 U.S. at 300-01.

Here, Gary was unavailable at trial. Gary's testimony from the preliminary hearing was admitted under hearsay exception K.S.A. 60-460(c) (prior testimony where the defendant had the opportunity for cross-examination). The defendant reasons that because the State was permitted to present Gary's previous testimony, the State opened the door for Gary's other out-of-court statements. The defendant cites no authority for this argument. Each hearsay statement admitted at trial must satisfy a hearsay exception. Prior testimony of an unavailable witness may be admitted under a hearsay exception, but other out-of-court statements made by the same witness are not admissible when a specific hearsay exception does not apply to the other statements. The fact that Gary's prior testimony was admitted does not make his other out-of-court hearsay statements admissible unless the statements satisfy some other hearsay exception.

However, some of the requirements of K.S.A. 60-460(j) and the factors mentioned in *Chambers* appear to be satisfied for at least two of the admissions. The statements Gary made to Laura Haase and Teri Frye were unquestionably against Gary's interest and subjected him to potential criminal liability. The statements were admissions that he killed Johnston. They were corroborated by other evidence, including the defendant's own testimony. The statements were also corroborated by the testimony of witnesses who stated Travis Church told them Gary had committed the murder and the testimony that Gary's gun was the murder weapon. The statements appear to have been made spontaneously and without motivation. The only factor of *Chambers* which does not appear to be satisfied is that the declarant be available for cross-examination. This is not a requirement under K.S.A. 60-460(j). See *Jackson*, 244 Kan. at 624.

However, K.S.A. 60-460(j) does require a showing of trustworthiness. The trial court found that this trustworthiness was not shown.

The statement which T.J. Weston heard, although it was against Gary's interest, does not have the requisite trustworthiness. The statement admitted that Gary "pulled the trigger" but gave no other details of the shooting. A similar situation was discussed in *Jackson*, 244 Kan. 621. There, the defendant was charged with stabbing the victim at a club. This court discussed the admissibility of a hearsay statement in which the declarant, Tommie Mays, told the witness, Hankins, about a stabbing and said that it was better the other guy than him. Mays indicated that the stabbing was at the club but did not indicate the date of the stabbing or the other victim's name. This court stated:

"Such vague and indefinite admissions fall short of the necessary showing of credibility and trustworthiness required to establish a proper foundation for admissibility of Hankins' testimony. We find no error in the trial court's determination that the Hankins testimony was not only irrelevant but also lacked reliability." *Jackson*, 244 Kan. at 626.

Likewise, T.J.'s proffered testimony about Gary's admission lacked reliability and trustworthiness. The admission mentioned pulling the trigger but did not indicate who the victim was, where the shooting occurred, or the date of the shooting. The fact that T.J. inferred Gary was referring to Johnston's murder at the Kwik Shop cannot be imputed to Gary. The trial court did not err in excluding T.J.'s testimony.

Gary's admissions to Laura Haase and Teri Frye show more indicia of trustworthiness and reliability. The statements were corroborated by other evidence. The statements appear to reference more details connecting Gary to Johnston's murder at the Kwik Shop. They were made within several weeks of the crime. Although the statements were not made to close acquaintances (*cf. Chambers*, 410 U.S. at 300), the statements were made to persons to whom Gary would presumably have no interest in lying. See *Jones*, 246 Kan. at 219 (admission made to person who met the declarant that same day was admissible). Gary's admission to Laura Haase indicated not only that he shot Johnston, but also that the defendant had confessed and had not really done it. The admission to Teri Frye included additional information, such as a $5 bet be-

tween Gary and Travis. Teri Frye was 15 years of age and had expressed orally and in writing that she was in love with Gary.

The trial court may have abused its discretion in excluding Gary's admissions made to Laura Haase and Teri Frye. That, however, does not end the inquiry. In *Jones*, 246 Kan. at 219, this court indicated that a harmless error analysis applies where admissible hearsay is wrongfully excluded. To declare an error harmless, this court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. White*, 246 Kan. 28, 37, 785 P.2d 950, *aff'd as modified* 246 Kan. 393, 789 P.2d 1175 (1990).

Here, the evidence of the defendant's guilt was overwhelming. The defendant had confessed to the police and made admissions to other witnesses. The jury had before it evidence that Gary, not the defendant, committed the crime. There was the defendant's own testimony that Gary did it as well as statements by Travis Church that Gary committed the crime. There was also evidence that Gary's gun was the murder weapon. The jury chose to disregard this evidence and convicted the defendant either as a principal or as an aider and abettor. Moreover, the trial court's exclusion of the evidence was harmless error because the testimony of Laura Haase and Teri Frye did not clearly exculpate the defendant in that their motives may have been tainted. The defendant wrote letters from jail, which were intercepted, giving every indication he encouraged witnesses to give false testimony and to conceal and destroy evidence. We conclude any error in excluding this testimony was harmless because it had little, if any, likelihood of having changed the result of the trial.

## II. VOLUNTARY INTOXICATION

The defendant's next argument is that the trial court erred in rejecting his request that the jury be instructed on the defense of voluntary intoxication. K.S.A. 21-3208(2) provides:

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

"A defendant may rely on the defense of voluntary intoxication where the crime charged requires specific intent, and an instruction thereon is required if there is evidence to support the defense." *State v. Gadelkarim*, 247 Kan. 505, Syl. ¶ 1, 802 P.2d 507 (1990).

The defendant reasons that voluntary intoxication was a viable defense because the jury was given an instruction on aiding and abetting. Aiding and abetting is a specific intent crime. See *State v. Warren*, 252 Kan. 169, Syl. ¶ 6, 843 P.2d 224 (1992); *State v. McDaniel & Owens*, 228 Kan. 172, 178-79, 612 P.2d 1231 (1980). Additionally, the court is aware that premeditated first-degree murder, the crime with which the defendant was charged (and convicted), is itself a specific intent crime, making the defense of voluntary intoxication available regardless of the instruction on aiding and abetting.

The trial court rejected the defendant's proposed instruction on voluntary intoxication, reasoning that although there was evidence to indicate the defendant had been drinking or smoking marijuana, there was no evidence he was intoxicated.

A defendant is entitled to have the jury instructed on his or her theory of defense even if the evidence is slight. *State v. Hunter*, 241 Kan. 629, 646, 740 P.2d 559 (1987). However, unless evidence is presented that shows the defendant was intoxicated to the extent that his or her ability to form the requisite intent was impaired, an instruction on the defense of voluntary intoxication is not required. *Gadelkarim*, 247 Kan. at 508; see *State v. Smith*, 254 Kan. 144, Syl. ¶ 2, 864 P.2d 709 (1993); *State v. Shehan*, 242 Kan. 127, Syl. ¶ 5, 744 P.2d 824 (1987). Without evidence of impairment, the mere consumption of alcohol and drugs is insufficient to require a voluntary intoxication instruction. See *Shehan*, 242 Kan. at 132. The defendant has the burden of showing that he or she was so intoxicated that his or her mental faculties were impaired by the consumption of alcohol or drugs. See *State v. Keeler*, 238 Kan. 356, 360, 710 P.2d 1279 (1985).

The defendant has not met his burden here. Although there was evidence, presented by both the State and the defense, that the defendant had consumed alcohol and drugs on the night of the

offense, the record is devoid of evidence that the defendant's consumption of those substances impaired his mental faculties so as to render him unable to form the requisite intent. There was no evidence that the defendant's physical or mental abilities were impaired. In fact, the evidence demonstrates the defendant's mental abilities were clearly intact in that he was able to recall in detail the events which occurred the night of the offense. See *State v. Ludlow*, 256 Kan. 139, 147-48, 883 P.2d 1144 (1994); *Smith*, 254 Kan. at 152; *State v. Gonzales*, 253 Kan. 22, 26, 853 P.2d 644 (1993); *Shehan*, 242 Kan. at 131-32; *Keeler*, 238 Kan. 356; *cf. Gadelkarim*, 247 Kan. at 509. The trial court did not err in rejecting the defendant's proffered instruction on voluntary intoxication.

## III. PROSECUTION AS AN ADULT

The defendant next contends that the trial court erred in certifying him for prosecution as an adult.

The court may authorize a juvenile to be prosecuted as an adult if the juvenile was 16 years old at the time of the offense and there is substantial evidence that the juvenile should be prosecuted as an adult. K.S.A. 38-1636(f)(3). K.S.A. 38-1636(e) sets forth eight factors which shall be considered in determining whether the juvenile should be prosecuted as an adult:

"(1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the offense was against a person or against property, greater weight being given to offenses against persons, especially if personal injury resulted; (4) the number of alleged offenses unadjudicated and pending against the respondent; (5) the previous history of the respondent, including whether the respondent had been adjudicated a delinquent or miscreant under the Kansas juvenile code or a juvenile offender under this code and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence; (6) the sophistication or maturity of the respondent as determined by consideration of the respondent's home, environment, emotional attitude, pattern of living or desire to be treated as an adult; (7) whether there are facilities or programs available to the court which are likely to rehabilitate the respondent prior to the expiration of the court's jurisdiction under this code; and (8) whether the interests of the respondent or of the community would be better served by criminal prosecution."

K.S.A. 38-1636(e) further states that "[t]he insufficiency of evidence pertaining to any one or more of the factors listed in this subsection shall not in and of itself be determinative of the issue." Our standard of review is whether there is substantial evidence supporting the trial court's decision. See K.S.A. 38-1636(f)(3); *State v. Tran*, 252 Kan. 494, 508, 847 P.2d 680 (1993).

The defendant was 17 years old at the time of this offense, 3 weeks from his 18th birthday. The trial court noted the defendant's age and stated that it had considered all eight factors mandated by K.S.A. 38-1636(e). The court specifically noted the nature and seriousness of the crime (factor 1); the fact that the crime was committed in an aggressive, violent, and premeditated manner against a person (factors 2 and 3); the defendant's previous contact with the criminal justice system (he had several contacts with the juvenile authorities in Florida for stealing a hood ornament, shoplifting, and a series of residential burglaries) (factor 5); the defendant's home environment and emotional attitude (factor 6); the ability and resources which Kansas has available to rehabilitate the defendant (factor 7); and the needs of the community (factors 1 and 8). The only factor the trial court did not specifically mention was factor 4, evaluating the number of alleged offenses unadjudicated and pending. There was testimony that the defendant had been arrested for shoplifting at a Wal-Mart store in El Dorado the day after this offense, but there was no testimony as to whether that offense was adjudicated or pending at the time of the certification hearing.

The defendant argues that although he was 17 years old at the time of the offense, he was emotionally and intellectually much younger. He points out his family background. The defendant's mother was a teenager when he was born, and he never knew his father. He was eventually adopted by a man his mother married. This man physically and sexually abused the defendant. The abuser received only 5 years' probation. When the defendant's mother could no longer handle him, she sent him from Florida to Kansas to live with a cousin. The defendant's mother eventually moved to Kansas. The defendant lived with her briefly, but their relationship was difficult. Thus, the defendant continued to live with his cousin

or in foster care. The defendant was eventually placed in SRS custody, but he continued to run away from his placements. The defendant's mother, who had returned to Florida, and his former principal in Florida testified that the defendant was in need of a highly structured system. However, such treatment had never been provided to defendant. The defendant stresses that not only did his family fail him, but the government failed him as well. Finally, he reasons that the juvenile justice system has adequate resources to rehabilitate him.

There was no error in certifying the defendant for prosecution as an adult. The trial court adequately considered each of the factors mandated by K.S.A. 38-1636(e). Indeed, the defendant's argument seems to be not that the trial court failed to consider the factors, but that the trial court erred in its analysis in weighing the factors. The defendant's previous history includes prior contact with authorities. He was charged with first-degree murder, an aggressive and premeditated crime against a person. Moreover, the defendant was only 3 weeks shy of his 18th birthday at the time of the offense. Even if there was inadequate evidence on any one factor, such as the availability of juvenile resources or his emotional immaturity, that fact alone does not preclude prosecution as an adult. See K.S.A. 38-1636(e). Our review of the record reveals substantial evidence supporting the trial court's decision to certify the defendant for prosecution as an adult.

## IV. CHANGE OF VENUE

For his next claim of error, the defendant asserts that the district court abused its discretion by denying his motion for change of venue. K.S.A. 22-2616(1) states that the trial court, upon motion of the defendant, shall transfer the case to another county or district "if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

This court recently stated the standard of review concerning the denial of a change of venue:

"The determination of whether to change venue is entrusted to the sound discretion of the trial court; its decision will not be disturbed on appeal absent a

showing of prejudice to the substantial rights of the defendant. The burden is on the defendant to show prejudice exists in the community, not as a matter of speculation, but as a demonstrable reality. The defendant must show that such prejudice exists in the community that it was reasonably certain he or she could not have obtained a fair trial." *State v. Butler*, 257 Kan. 1043, Syl. ¶ 2, 897 P.2d 1007 (1995).

See *State v. Lumbrera*, 252 Kan. 54, Syl. ¶¶ 2, 3, 845 P.2d 609 (1992); *State v. Grissom*, 251 Kan. 851, 927-29, 840 P.2d 1142 (1992).

The defendant argues that pretrial publicity surrounding the case created circumstances warranting a change of venue. He points out that one juror opined that all of the prospective jurors had heard about the case. After "numerous" jurors were excused for cause when questioned about pretrial publicity, the remaining venirepersons "were getting a clear message. If they talked too much about the pretrial publicity or acknowledged that they had an opinion about the case, they would not have a chance to get on the jury." Even a cold reading of the transcript of voir dire, the defendant reasons, demonstrates that it was impossible to impanel a fair and impartial jury in Butler County.

The jury selection process occurred as follows. Forty venirepersons were called initially. The court extensively questioned the venire about pretrial publicity. Only eight venirepersons were excused for cause (three of whom knew the victim) based on prior knowledge of the case due to media publicity or other sources.

The defendant's counsel questioned each venireperson individually about his or her knowledge of the case. Of the 40 venirepersons, approximately 28 indicated that they had either seen something about the case in the newspaper or on television, or they had heard about it from a friend or relative. Of those, 13 specified that they had heard about the case only immediately after it happened, and another 6 indicated that they had heard about the case only in passing and did not follow it. Each venireperson indicating that he or she had heard or read about the case stated that he or she had not formed an opinion, could be fair and impartial, and could decide the case based on the evidence.

Following this questioning, the defendant renewed his motion for a change of venue. The defendant's counsel suggested that the venirepersons were, as a group, somewhat reluctant to respond to questions, particularly those concerning whether the venirepersons had heard about the case. He posited that more extensive questioning would reveal even more knowledge about the case. Counsel mentioned 14 newspaper articles of which he had copies. He specifically noted an article which apparently ties the defendant to another murder. The defendant's counsel pointed out that the pretrial publicity was an ongoing occurrence, with an article as recent as a few days before trial. Counsel concluded that the defendant's opportunity for a fair trial had been compromised, arguing that the dismissal of several jurors for cause because they had already formed opinions about the case poisoned the entire jury pool.

The defendant's argument that the venirepersons were not entirely forthcoming in admitting their knowledge of this case based on pretrial publicity is entirely speculative. The extent of pretrial publicity is not clear from the record on appeal. However, during voir dire various persons mentioned television reports and newspaper articles in the Augusta, El Dorado, and Wichita newspapers. Each venireperson was directly questioned about how extensively he or she had read or heard about the case. All venirepersons indicating some knowledge about the case, except those excused for cause, unequivocally stated that they had not formed an opinion about the case. The venirepersons stated that they could be fair and impartial and would decide the case based on the evidence. These responses do not suggest such prejudice against the defendant due to pretrial publicity that the defendant was unable to receive a fair trial in Butler County.

In *State v. Ruebke*, 240 Kan. 493, 500-01, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987), this court stated:

"Media publicity alone has never established prejudice per se. The trial court had no difficulty in finding from the jury panel jurors who stated that they could render a fair and impartial verdict. The small number of jurors dismissed by the court for cause and the effort of the judge to press no one into jury service who showed the slightest hint of prejudice established that there was no abuse of discretion in denying a change of venue. Unless we are to assume that (1) the

jurors selected to try the defendant violated their oath when they swore that they could give the defendant a fair trial or (2) an individual can commit a crime so heinous that news coverage generated by that act will not allow the perpetrator to be brought to trial, the defendant has not established substantial prejudice. There was no abuse of discretion on the part of the court in denying the defendant's motion for change of venue."

See *Butler*, 257 Kan. at 1057.

As in *Ruebke*, the trial court here had no difficulty in finding jurors who could render a fair and impartial verdict. Of 48 venirepersons examined, 40 had either not heard any pretrial publicity or had unequivocally stated that they were not influenced by the pretrial publicity. There is no evidence here that the jurors did not decide the case based solely on the evidence presented at trial. The trial court did not abuse its discretion in denying the defendant's motion for a change of venue.

## V. DEFENDANT'S CONFESSION

Finally, the defendant argues that the trial court erred in admitting into evidence his confession. On April 13, 1993, the defendant filed a motion to suppress his confession. Reasons given were that the confession was not freely, voluntarily, and intelligently made and that the defendant was under severe duress when he signed the *Miranda* waiver.

The trial court conducted a full pretrial hearing on the admissibility of the defendant's confession. David McNown testified that he and KBI Agent Green began interviewing the defendant around 4:30 p.m. The defendant had been in custody since noon that day, and had been previously interviewed by other officers while in custody. The interview with Green and McNown took place in a 12 by 20 foot library room. The defendant had no leg or other restraints on, and the room temperature was comfortable. Green explained the *Miranda* rights to the defendant. The defendant did not state that he did not understand his rights. The defendant indicated that he had not previously asked for an attorney. After being advised of his *Miranda* rights, the defendant initialed a statement indicating he understood each right and signed a waiver. To indicate his understanding of his rights, the defendant stated, "If

I don't want to talk I don't have to. I can have a lawyer if I want. What I say can be used in court." At that time, he did not appear to be, nor did he state that he was, under the influence of alcohol or drugs.

Green began questioning the defendant about his activities on October 19 and 20, 1992. Around 5:30 p.m., McNown obtained a hamburger and a coke for the defendant. Then, Green confronted the defendant and laid out various scenarios of what might have happened. Around 7:00 p.m., the defendant confessed, stating, "I did it," and hitting the wall with his fist. During the questioning, the defendant appeared at various times bored, quiet, and on the verge of crying. After saying, "I did it," the defendant began crying uncontrollably. Green placed his hand on the defendant to comfort him. Green asked if the defendant might want to express his apologies to the Johnston family in writing. The defendant did so. He explained to the officers in some detail what occurred and why. After making his confession, the defendant indicated that he would like to speak with his "mother" and "brother," Frankie Grissom and her son, Gary Hastings. McNown testified that the defendant never asked for an attorney.

The interview with Green and McNown was not recorded. McNown and Green indicated that they did not routinely record interviews. However, McNown and Green did take detailed notes of the interview.

The defendant was taken to the hospital to have his hand examined. Upon returning, the prosecutor asked the defendant, with Green and McNown present, if he could tape-record an interview. The defendant then recanted his confession, saying that he had lied and that he had no knowledge about the homicide.

The trial court found that the confession was freely and voluntarily made, following a knowing and intelligent *Miranda* waiver. Thus, the trial court denied the defendant's motion to suppress his confession.

In *State v. Morris*, 255 Kan. 964, 971, 880 P.2d 1244 (1994), this court reiterated our standard of review concerning admission of custodial statements:

"The first question for this court to determine is whether there is substantial competent evidence to support the district judge's finding that the confession was voluntary. In determining whether a confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession or admission is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. *State v. Price*, 247 Kan. 100, Syl. ¶ 1, 795 P.2d 57 (1990). When a trial court conducts a full hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits the statement into evidence at trial, an appellate court accepts that determination if it is supported by substantial competent evidence. See *State v. Johnson*, 253 Kan. 75, 83-84, 853 P.2d 34 (1993)."

See also *State v. Garcia*, 250 Kan. 310, Syl. ¶ 2, 827 P.2d 727 (1992) ("If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court.").

The defendant argues that his statement, "I did it," is not reliable. He points out that he was in custody for over 4 hours before Green and McNown began questioning him. The defendant suggests that he merely told the officers what they wanted to hear. The defendant stresses that he was only 17 and had only a tenth grade education, most of which was in special education classes. The defendant had a history of childhood abuse and psychological problems. He had an addictive personality and was not permitted to smoke cigarettes during the questioning. The defendant was using drugs the night before the confession. Finally, the defendant suggests that because the interview was not tape-recorded, it is unknown what manner of "persuasion" was used to elicit the defendant's confession.

The defendant's argument that the confession was somehow coerced is speculative. The defendant was 3 weeks away from his 18th birthday. He had had contact with the police before. Although he had been in custody for 7 hours before his confession, he was not in any restraints. Contrary to the defendant's assertion that his

confession was not reliable, the evidence at trial revealed that not only did the defendant state, "I did it," he also gave a description of how he committed the crime. The totality of the circumstances shows that the defendant knowingly and intelligently waived his *Miranda* rights and made a voluntary confession. There was substantial competent evidence to support the trial court's finding that the confession was voluntary and admissible.

Affirmed.